IN RE PROMULGATION OF GUARDIANSHIP
SERVICES REGULATIONS.

Argued March 17, 1986—Decided July 30, 1986.

620

*Linda J. Robinson,* Assistant Deputy Public Advocate, argued the cause for appellant Public Advocate (*Alfred E. Slocum,* Public Advocate, attorney).

*Carol L. Widemon,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Human Services, Division of Mental Retardation (*W. Cary Edwards, Jr.,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel; *Susan R. Oxford,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

O'HERN, J.

It has long been recognized that freedom of personal choice in matters of family life is one of the liberties protected by the due process clause of the fourteenth amendment to the United States Constitution. *Zablocki v. Redhail,* 434 *U.S.* 374, 385, 98

*S.Ct.* 673, 680, 54 *L.Ed.*2d 618, 630 (1978) (quoting *Cleveland Bd. of Educ. v. LaFleur*, 414 *U.S.* 632, 639–40, 94 *S.Ct.* 791, 796, 39 *L.Ed.*2d 52, 60 (1974)).

> The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.
>
> [*Wisconsin v. Yoder*, 406 *U.S.* 205, 232, 92 *S.Ct.* 1526, 1541, 32 *L.Ed.*2d 15, 35 (1972).]

It is also an unfortunate reality of American life that in some instances parents are either unable or unwilling to provide the care and nurturing needed by their minor children. The welfare of those children is, of course, always an important consideration in any case pitting the state, as *parens patriae*, against the rights of natural parents. *See Santosky v. Kramer*, 455 *U.S.* 745, 747–48, 102 *S.Ct.* 1388, 1391–92, 71 *L.Ed.*2d 599, 603 (1982) (state may terminate parental rights upon clear and convincing evidence that termination is in child's best interest); that concern becomes even more acute when the children involved are mentally retarded.

At issue in this case are regulations of the Department of Human Services that empower its Division of Developmental Disabilities (DDD), formerly the Division of Mental Retardation (DMR),[1] to assume a supervisory guardianship role over mentally retarded minors whenever it determines that the minors' parents or guardians are absent and cannot be located. That determination and the subsequent exercise of guardianship under the regulations are accomplished entirely in-house, without the participation of a judge or other independent adjudicator. The agency's guardianship role ceases automatically upon the reappearance of a parent or legal guardian.

---

[1] On May 24, 1985, the DMR was disbanded and its powers and duties assumed by the DDD. *L.*1985, *c.* 145, §§ 2 & 6. The regulatory provisions at issue continue to refer to DMR. In the interest of simplicity, we will hereinafter refer to the agency as the "Division" or "DMR," but our holdings apply with equal force to the new DDD.

The Public Advocate has challenged the Division's rules on the grounds that the regulations exceed the agency's authority, unconstitutionally discriminate against mentally retarded minors, and violate the due-process rights of affected parents. Because of the important interests involved, we granted the Public Advocate's petition to review the judgment of the Appellate Division, *In re Guardianship Servs. Regulations,* 198 *N.J.Super.* 132 (1984), upholding the regulations. 102 *N.J.* 366 (1985). With certain modifications, we now affirm that judgment.

## I.

In 1983, the Department of Human Services, ostensibly to "fill a gap" in the existing statutory scheme governing the provision of guardianship services to mentally retarded individuals, promulgated *N.J.A.C.* 10:45–1.3 and –1.4.[2]

---

[2]The pertinent provisions of the regulations read as follows:
10:45–1.3  Eligibility

\* \* \* \* \* \* \* \*

(b) To be eligible for guardianship services, a mentally retarded minor must:

1. Be receiving functional services from the Division of Mental Retardation;

2. Be orphaned or abandoned and have no legally appointed guardian. Such status shall be verified by either:

i. Documentation that the child's legal guardian(s) is (are) deceased or;

ii. Documentation that the following efforts to locate the child's guardian have been unsuccessful:

(A) Notice by regular mail and follow-up by certified mail, return receipt requested, to the guardian's last known address, with no response received within 45 days;

(B) Discrete inquiry among any known relations, friends and current or former employers of the parent(s); and

(C) Direct inquiries, unless otherwise restricted by law, using the guardian's name and last known or suspected address, to the local post office, the Division of Motor Vehicles and any social service and law enforcement agencies known to have had contact with the guardian(s) both in New Jersey and other states. Failure to receive a response to the inquiries within 45 days shall constitute a negative response.

\* \* \* \* \* \* \* \*

Briefly stated, the regulations are designed as an interim measure that allows the Division to provide guardianship-of-the-person services to mentally retarded minors in need of such supervision by reason of the death or prolonged absence of the minors' parents or legal guardians. "Guardianship services" are broadly defined in *N.J.S.A.* 30:4–165.4, as amended by *L.* 1985, *c.* 133, § 1, as "those services and programs provided by the Division of Mental Retardation for the purpose of implementing its responsibility toward the individuals for whom it is performing the services of guardian of the person." The actual provision of guardianship services is accomplished through the DMR's Bureau of Guardianship Services. *N.J.A.C.* 10:45–1.- 4(b).

The regulations had as their impetus a report by the then-Division of Mental Retardation that identified 130 children currently receiving DMR services who had no identifiable or accessible guardian. Although the DMR was specifically authorized by statute to provide the services of "guardian of the person" to individuals receiving Division care, the provision, *N.J.S.A.*

---

(d) Eligibility for a child continues as long as he or she:

i. Is receiving functional services;

ii. Is under the age of 18 years, and;

iii. Has no available legal guardian of the person. In any instance when a parent or legally appointed guardian, who had been previously inaccessible, again becomes available to exercise their role, guardianship services shall immediately and automatically cease.

(e) Prior to reaching the age of majority, a determination must be made regarding the issue of mental deficiency and the continuing need for guardianship services as an adult (*N.J.S.A.* 30:4–165.5; *N.J.A.C.* 10:43). 10:45–1.4. Provision of guardianship

\* \* \* \* \* \* \* \*

(b) When a client is under 18 years of age and has met the eligibility criteria above (*N.J.A.C.* 10:45–1.3(b)), the Bureau of Guardianship Services shall provide guardianship of the person services.

Deleted from the text of the rules are comparable provisions that govern interim guardianship services to mentally disabled adults for whom there is no court-appointed guardian. Those provisions are not before the Court; the Public Advocate, as he did in the Appellate Division, has limited his challenge to only those portions of the regulations relating to mentally disabled minors.

30:4–165.5, by its own terms applied only to mentally retarded persons over age 21. There was and still is, however, no comparable statutory authorization for "guardian of the person" services to minors receiving Division care who, through death or abandonment, suddenly find themselves without legal guardians.[3]

Finding a gap in the DMR's ability to provide for the needs of mentally retarded minors, short of a lengthy proceeding seeking court appointment as legal guardian pursuant to *N.J.S.A.* 30:4C–15 to –24, the Commissioner of the Department of Human Services, in late 1983, adopted *N.J.A.C.* 10:45–1.3(b), (d), and –1.4(b).

The Division's position is that the scope of the regulations is limited. They apply only to those children already receiving Division "functional services" (see *infra* n.4); the DMR's guardianship of the person is triggered only after a finding of orphanage or temporary or permanent abandonment, a determination that turns on a series of strict notice requirements that produce no response from a parent or guardian within 45 days; and guardianship authorization lasts only so long as the parents or legal guardian remain unavailable or until the child reaches majority. Under the regulations, the Division's power to make decisions affecting the health, safety, and personal welfare of a minor is roughly equivalent to that of a parent. *See N.J.S.A.* 3B:12–51 and –52 (defining powers of guardian of the person of minor).

---

[3]While this case was pending, *N.J.S.A.* 30:4–165.5 was amended to prohibit the DMR from providing guardianship-of-the-person services for mentally retarded adults absent court appointment of the Division as guardian. *L.*1985, *c.* 133, § 2. We draw no inference from this amendment, however, of a legislative intent to require similar treatment of orphaned or abandoned minors. The statute governing treatment of adults does not address the situation that is at the center of this controversy: the treatment of minors who temporarily have no available guardian. We therefore believe that the Legislature did not intend to change the law concerning minors when it amended *N.J.S.A.* 30:4–165.5.

The Division maintains that it does not actually assume legal guardianship under the regulations, nor does it desire to be appointed permanent legal guardian. The intent of the provisions, it asserts, is to provide continuity in meeting the guardianship needs of mentally retarded minors in the interim between the death or permanent absence of a legal guardian and the court appointment of a new guardian, or during the periods when legal guardians may absent themselves for extended periods of time, short of permanent abandonment.

## II.

The Public Advocate's three-part attack on the facial validity of these regulatory provisions begins with the assertion that the regulations are in excess of the Department's statutory authority. We disagree, and find that the regulations are clearly " 'within the fair contemplation of the delegation of the enabling statute.' " *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561–62 (1978) (quoting *Southern Jersey Airways, Inc. v. National Bank of Secaucus,* 108 *N.J.Super.* 369, 383 (App.Div.1970)).

The Legislature has broadly charged the Division with the responsibility of providing comprehensive services, including guardianship services, to mentally retarded persons. *N.J.S.A.* 30:4–165.1. In addition, the Commissioner of the Department of Human Services has been delegated the power to make all reasonable and necessary regulations "to ensure the health, safety, welfare and earliest appropriate release of persons admitted to residential services for the mentally retarded." *N.J.S.A.* 30:4–25.7. When faced with the kind of sweeping legislative mandate and broad rulemaking authority present in this case, our courts have traditionally afforded the agency charged with implementing the legislative policy a presumption of validity and reasonableness in its rulemaking. *New Jersey Guild of Hearing Aid Dispensers v. Long, supra,* 75 *N.J.* at 561. Agency powers are to be liberally construed, and regula-

tions fairly implicit in the statutory scheme will be upheld unless they are irrational, arbitrary, or otherwise contrary to law. *Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs.*, 96 *N.J.* 456, 477 (1984). There is nothing of the sort in these regulations.

We have on more than one occasion recognized this State's "strong moral and legal commitment to care for the handicapped." *New Jersey Ass'n for Retarded Citizens, Inc. v. New Jersey Dep't of Human Servs.*, 89 *N.J.* 234, 249 (1982); *see also Levine v. Department of Institutions and Agencies*, 84 *N.J.* 234, 249 (1980) (noting societal commitment "to provide for the care of mentally retarded persons"). As we stated in *New Jersey Ass'n for Retarded Citizens:*

> The Legislature has declared it the policy of this State to maximize the developmental potential of these citizens while affording them the maximum feasible personal liberty. Like all other citizens, the mentally retarded have the right to pursue happiness. Unlike other citizens, they have unique hurdles to overcome in doing so. Rather than exclude them from the pursuit of happiness, the Legislature has made an effort to include them in our civic community by providing them the special services they need to develop and grow.
>
> [89 *N.J.* at 252.]

To that end, the Department of Human Services, and, in particular, the DMR, has been charged with assessing the special needs of our less-fortunate children, and providing the special services to meet those needs. It is an area of agency experience and expertise in which a court should be particularly hesitant to substitute its judgment when the agency asserts a special need for an authority to make interim decisions for the best interests of the orphaned or abandoned mentally retarded child. *In re Barnert Memorial Hosp. Rates*, 92 *N.J.* 31, 41 (1983) (judicial deference to discretion exercised by agency experts); *Mayflower Securities Co. v. Bureau of Securities*, 64 *N.J.* 85, 93 (1973) (court should defer to agency where expertise is pertinent factor).

The Public Advocate urges that the provisions of *N.J.S.A.* 30:4C–15 to –24, authorizing the Department of Human Services to seek guardianship of minors through a court petition to

terminate parental rights, operate as the sole statutory recourse for the assertion of guardianship over all minors. We agree with the Appellate Division, however, that nothing in the statutory scheme suggests that the termination-of-parental-rights statute precludes the agency from promulgating rules allowing it to provide interim guardianship-of-the-person services to mentally retarded children who temporarily have no available guardian.

Some idea of the dimension of an action to terminate parental rights can be found in *New Jersey Div. of Youth and Family Servs. v. A.W.*, 103 *N.J.* 591 (1986), also decided today. By contrast, the regulations at issue here neither authorize the agency to terminate parental rights nor otherwise assert permanent guardianship over minors. They are intended as a means of providing interim guardianship services until such time as a parent or guardian reappears or a new guardian is appointed by the court; there is no attempt to terminate parental rights. To that extent, the regulations are not in conflict with the statutory guardianship-appointment provisions. Indeed, they may be viewed as complementing the statutory scheme by providing for interim guardianship services where the statute, *N.J.S.A.* 30:4C–15, contemplates only a more permanent separation of parent and child.

We view these regulations, as does the Division, as a method of ensuring adequate care of mentally handicapped children during periods when guardianship proceedings may be pending in the Department, or in court, or when parents are temporarily absent. On their face, *N.J.A.C.* 10:45–1.3 and –1.4 appear to be a sincere attempt by the Division to carry out the State's moral and legal commitment to meeting the special needs of mentally handicapped minors who temporarily find themselves wards of no one in particular. The regulations enable the Division to provide necessary guardianship services without first having to involve the Division of Youth and Family Services or the courts in a time-consuming and potentially unnecessary proceeding to determine permanent legal guardianship.

Given the Legislature's directive to provide "comprehensive * * * guardianship services," *N.J.S.A.* 30:4–165.1, we find these regulations implicit in the legislative mandate, consistent with public policy, and therefore within the agency's authority.

### III

The Public Advocate also challenges the facial validity of the regulations on the grounds that they infringe the fundamental rights of parents without due process of law, and deny mentally retarded minors the equal protection of the laws by treating them "differently [from] all other children * * * for the purpose of appointment of a guardian."

### A. *Equal Protection*

The Appellate Division correctly rejected the Public Advocate's claim that legislative or agency classifications based on mental disability are entitled to "suspect" or "quasi-suspect" status for purposes of equal-protection review under the fourteenth amendment. That proposition was recently settled by the United States Supreme Court in *City of Cleburne v. Cleburne Living Center,* 473 *U.S.* ——, 105 *S.Ct.* 3249, 87 *L.Ed.*2d 313 (1985):

> [W]e conclude for several reasons that the Court of Appeals erred in holding mental retardation a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation.
>
> [*Id.* 473 *U.S.* at ——, 105 *S.Ct.* at 3255–3256, 87 *L.Ed.*2d at 321.]

The appropriate inquiry, according to the Court, is whether application of the regulations solely to mentally retarded minors is rationally related to furthering a legitimate state interest. *Id.* 473 *U.S.* at ——, 105 *S.Ct.* at 3254, 87 *L.Ed.*2d at 320. Although equal-protection analysis under our State Constitution is somewhat more flexible, *see Right to Choose v. Bryne,* 91 *N.J.* 287, 304–05, 309 (1982), we see no need, in this context, to extend our state protections further, particularly in view of our

analysis of the nature of the personal rights involved, *infra* at 639–642.

Neither party questions that the State has a legitimate interest in providing for the interim guardianship needs of mentally handicapped minors for whom no decision-maker is immediately available. Nor have we any doubt that there is a rational basis for drawing a distinction between the procedures applicable to mentally handicapped children who become orphaned or abandoned, and those applicable to all other children for whom guardianship appointment is made only after a judicial hearing.

At the very least, the needs of the mentally handicapped as a class may frequently be greater and more immediate than those of non-disabled children. It is certainly rational to assume that the need for continuity in day-to-day supervisory authority is more compelling in the case of mentally retarded children than in the case of children suffering from no such disability. That distinction alone provides a rational basis justifying the extra-judicial provision of such interim guardianship services to the mentally handicapped.

Further, the regulations apply only to those children already receiving DMR "functional services" pursuant to parental consent or court order.[4] In effect, the regulations empower the

---

[4]Pursuant to *N.J.S.A.* 30:4–25.2, mentally retarded minors may be eligible for Division functional services upon the application of a parent or other legal guardian. "Functional services" for the mentally retarded include:

> (1) Nonresidential functional services shall include but need not be limited to: evaluation, counseling of family or guardian, of employer, or of retarded person; consultative services to social, educational, or welfare and health agencies and to the courts; day-care programs; and day training programs.
>
> (2) Residential functional services shall include but need not be limited to: evaluation study, treatment, education, training, rehabilitation, care and protection provided in State schools and in other residential facilities operated by the department; family care and sheltered life programs; interim placement in approved residential facilities other than State schools. Such programs may be of short- or long-term duration as required.

[*N.J.S.A.* 30:4–165.2.]

Division to provide guardianship services to only those children whose individual needs and problems are already intimately familiar to the Division and its workers. It is therefore not irrational to assume that the need for judicial supervision is less compelling in these circumstances than in a case where the agency is a stranger to the child, or, seeking to terminate parental rights, is in an adversarial position to the parents.

Finally, we agree with the Appellate Division, 198 *N.J.Super.* at 151–52, that there is a fundamental difference in the nature of the guardianship created under *N.J.A.C.* 10:45–1.3 and –1.4 and that created under other guardianship statutes that contemplate judicial selection of the guardian. Foremost is that, unlike the situation under *N.J.S.A.* 30:4C–15 to –24, here the State is not seeking permanent guardianship or custody via the termination of parental rights. The role of the State is not that of an adversary of the parent or legal guardian; the State's role is merely supplemental and temporary. The agency's authority ceases automatically upon the reappearance of a parent or guardian, even if the parent or guardian wishes it to continue. Moreover, unlike the powers of a court-appointed guardian, the agency's powers are limited to the provision of guardianship-of-the-person services; decisions regarding the disposition of property and the authorization of certain extreme medical procedures are beyond the ambit of the agency's authorized powers. We therefore agree with the appellate panel's conclusion that even under a higher standard of judicial scrutiny, "minors under legal guardianship and minors receiving guardianship services for the mentally retarded as provided by the regulations fall within separate classifications warranting disparate treatment under the state and federal equal protection clauses." 198 *N.J.Super.* at 152.

The regulations rationally further an important state interest and therefore comport with our precepts of equal protection.

## B. *Procedural Due Process*

■ The Public Advocate's final challenge to the facial validity of *N.J.A.C.* 10:45–1.3 and –1.4 is that the regulations infringe a fundamental liberty interest without due process of law. Specifically, he asserts that the regulations are inadequate procedurally because they fail to provide for a hearing before a court or other impartial adjudicator prior to the vesting of guardianship authority in the agency.

We note initially that these regulations touch upon a liberty interest that triggers the procedural protections afforded by the due-process clauses of both our state and federal constitutions. As stated at the outset, the right to be free from governmental interference in familial relationships is one of the fundamental liberty interests vested in all persons. *Zablocki v. Redhail, supra,* 434 *U.S.* at 385, 98 *S.Ct.* at 680, 54 *L.Ed.*2d at 630. We are not persuaded by the agency's argument that the assumption of supervisory authority under the regulations does not amount to a deprivation of that interest merely because it is temporary, or because there is no attempt to terminate parental rights. The rules empowering the Division to provide guardianship-of-the-person services confer decision-making authority that may affect the health, education, and well-being of the minor child. *See N.J.S.A.* 3B:12–51 and –52 (defining powers of guardian of the person of minor). Whether viewed from the perspective of the child, or from that of the parent or legal guardian, any supervisory decision made by the agency is a decision made outside the protected family relationship. Some of those decisions could have lasting impact. It is therefore of no moment to say that the intrusion is merely temporary, or that it is invited by the absence of the parents or legal guardian. We are satisfied that even the temporary provision of guardianship services amounts to an intrusion upon a constitutionally protected liberty interest and must comport with due process. *See, e.g., Stanley v. Illinois,* 405 *U.S.* 645, 647, 92 *S.Ct.* 1208, 1210, 31 *L.Ed.*2d 551, 556 (1972) (temporary interfer-

ence with relationship between natural father and children amounts to cognizable deprivation of fundamental right).

Once it is determined that procedural due process applies, "the question remains what process is due." *Morrissey v. Brewer*, 408 *U.S.* 471, 481, 92 *S.Ct.* 2593, 2600, 33 *L.Ed.*2d 484, 494 (1972). The United States Supreme Court has described due process as an elusive concept whose "exact boundaries are undefinable * * *." *Hannah v. Larche*, 363 *U.S.* 420, 442, 80 *S.Ct.* 1502, 1514, 4 *L.Ed.*2d 1307, 1321 (1960). The concept is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer, supra,* 408 *U.S.* at 481, 92 *S.Ct.* at 2600, 33 *L.Ed.*2d at 494. Our State view of what process is due is similar. In *Callen v. Sherman's, Inc.,* 92 *N.J.* 114 (1983), we stressed that due process is a "dynamic concept," *id.* at 136, whose "sense of fairness cannot be imprisoned in a crystal * * *." *Id.* at 134.

Notwithstanding the flexible nature of due process, it is now well settled that the guarantee requires, at a minimum, notice to the affected party combined with an effective opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill,* 470 *U.S.* 532, ——, 105 *S.Ct.* 1487, 1495, 84 *L.Ed.*2d 494, 506 (1985). Contrary to the Public Advocate's contention, we believe the rules at issue here meet those minimum requirements.

The regulations require notice by regular and certified mail, discreet inquiry among known friends, relatives, and employers of the parents or legal guardian, and direct contact with those governmental agencies most likely to know the whereabouts of parents or guardians during the course of a 45–day period. These requirements are clearly designed and adequate to inform the parents or guardian of the action to be taken; at the very least, the inquiries are calculated to produce their appearance—an act that, standing alone, terminates the agency's authority to act on behalf of the child.

The Public Advocate's fear that illiterate or non-English-speaking parents or relatives will fail to understand the mean-

ing or significance of the Division's inquiries, while an appropriate concern, is not fatal to the adequacy of the notice procedures. We presume, as did the Appellate Division, that the agency will use its best efforts to communicate in a manner and language appropriate to the particular circumstances in any given case. By virtue of its providing functional services, the Division will already be familiar with the circumstances of each family. As such, we think the concept of notice appropriate to the particularized needs of the case is fairly implicit in the regulations. We have no objection to reading such an obligation into these rules. *See Callen v. Sherman's, Inc., supra,* 92 *N.J.* at 134 (court may imply certain requirements, including notice, into statutes or rules).

The second minimum requirement—an opportunity to be heard prior to the deprivation of the protected interest—is also met by these regulations. The rules afford the parents or legal guardian 45 days in which to respond before the agency may initiate guardianship services. Indeed, the rules afford more than the minimum "opportunity to respond": the mere reappearance of a parent or legal guardian by itself terminates the agency action, thereby preventing any infringement of the liberty interest at stake.

Our conclusion that the rules meet the minimum requirements of procedural due process does not, however, end the inquiry. As noted earlier, the process due in any given case will vary "as the particular situation demands." *Morrissey v. Brewer, supra,* 408 *U.S.* at 481, 92 *S.Ct.* at 2600, 33 *L.Ed.*2d at 494. Here, the Public Advocate urges that given the magnitude of the liberty interest involved, due process requires a judicial hearing before the State can exercise authority reserved traditionally to a parent or court-appointed guardian. In essence, the argument is that prior to the initiation of guardianship services, a court must ratify that the child is indeed orphaned or abandoned, and must exercise its independent discretion in selecting a guardian of the person.

Although there is respected authority for the position that the participation of an "independent adjudicator" should be a fundamental requirement in all due-process cases, *see* Redish & Marshall, *Adjudicatory Independence and the Values of Procedural Due Process*, 95 *Yale L.J.* 455, 475–76 (1986), the Supreme Court has never held that the right to be heard of necessity means the right to a judicial hearing prior to intrusion upon a protected interest.[5]  Instead, the right to any additional process, including a judicial hearing, is governed by the now-familiar three-part balancing test of *Mathews v. Eldridge*, 424 *U.S.* 319, 96 *S.Ct.* 893, 47 *L.Ed.*2d 18 (1976):

> [T]he specific dictates of due process generally require [ ] consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
>
> [*Id.* 424 *U.S.* at 334–35, 96 *S.Ct.* at 902–03, 47 *L.Ed.*2d at 33.]

Consideration of these three factors leads to the conclusion that, on balance, due process does not require a judicial hearing in the circumstances contemplated by these regulations.

With respect to the first factor, the significance of the private interest involved is self-evident.  All parents possess a fundamental interest in the care, custody, and management of their children. *Santosky v. Kramer, supra*, 455 *U.S.* at 753, 102 *S.Ct.* at 1394, 71 *L.Ed.*2d at 606; *Stanley v. Illinois, supra*, 405 *U.S.* at 651, 92 *S.Ct.* at 1212, 31 *L.Ed.*2d at 558; *In re*

---

[5]But *see Goldberg v. Kelly*, 397 *U.S.* 254, 90 *S.Ct.* 1011, 25 *L.Ed.*2d 287 (1970), in which the Court required a full, adversarial, trial-type hearing prior to infringement upon a protected interest.  The *Goldberg* Court itself pointed out that its hearing requirement was limited to the special facts of that case, *id.* at 397 *U.S.* at 264, 90 *S.Ct.* at 1018, 25 *L.Ed.*2d at 297, which involved the termination of welfare benefits that could conceivably deny the recipient of all means of subsistence.  Subsequent cases have reaffirmed that a predeprivation hearing before an independent adjudicator is not a minimum procedural requirement. *Cleveland Bd. of Educ. v. Loudermill*, 470 *U.S.* 532, ——, 105 *S.Ct.* 1487, 1495, 84 *L.Ed.*2d 494, 506 (1985).

*Guardianship of Dotson*, 72 *N.J.* 112, 122 (1976) (Pashman, J., concurring). Nevertheless, we must emphasize again that the agency action involved here does not amount to a permanent deprivation of right—a situation that would clearly call for a full, adversarial, trial-type hearing. *See Santosky v. Kramer*, *supra*, 455 *U.S.* at 747–748, 102 *S.Ct.* at 1391–1392, 71 *L.Ed.*2d at 603 (state must prove grounds for termination of parental rights by clear and convincing evidence). Here, the agency is authorized to exercise parental prerogatives only so long as, and only to the extent, the parents or legal guardian fail to exercise them. In a very real sense, the regulations allow those who would complain of a constitutional deprivation to define both its existence and length. Thus, the magnitude of the parental interest involved, while important, is something significantly less than that involved in a termination-of-parental-rights case. *See, e.g., Logan v. Zimmerman Brush Co.*, 455 *U.S.* 422, 434, 102 *S.Ct.* 1148, 1157, 71 *L.Ed.*2d 265, 277 (1982) (length or finality of deprivation are factors to be considered in assessing due-process requirements).

The second *Mathews* factor—the risk that the procedures used will result in an erroneous deprivation of a right—has two relevant aspects here. The first is the risk that the decision to initiate guardianship services will be erroneous; the second is the risk that once in place, the agency may make erroneous decisions affecting the child's welfare.

There is little cause for concern with the former. As noted earlier, the notice provisions contained in the rules—together with our ruling that the notice be geared to the particular circumstances of the family as known to the agency—are adequately calculated to produce some response from a parent or legal guardian. All the notice procedures need be required to do is spur some response from those individuals legally accountable for the child; that response alone, without more, automatically terminates the agency's power to institute guardianship-of-the-person services. We believe these procedures are a fair and reliable means of determining whether the parents

are available. The risk that the combination of regular mail, certified mail, direct, and indirect inquiries to various friends, family, and agencies would fail to produce *any* response from parents who are truly available must be considered small.

More significantly, it is unlikely that the mere participation of a judicial officer would minimize the risk that parents may mistakenly be deemed inaccessible. Given that the rules contemplate a situation where the parents are not available to appear before the court, a judge would have little more to do than simply listen to an agency worker outline the attempts made over a 45–day period to locate the parents, and then certify that the parents cannot be found. The most that can be said is that a hearing at the end of the 45–day period would reduce the risk that the agency deviated from its own procedures. But in the absence of any evidence to the contrary, we must presume that the agency will act in accordance with law, including its own duly promulgated procedures. We therefore conclude the risk of an erroneous determination of parental unavailability under these regulations is small.

Of greater concern is the risk of error in the substantive judgment of the agency guardian as it may affect either the welfare of the child or the rights of the parents to participate in such decisions. Of course, not every exercise of guardianship services presages consequences to the child and its parents that are both potentially irreversible and erroneous. For those that do, we believe the qualifications imposed in Part IV of this opinion will minimize the risk of substantive error in a way that obviates the need for an adjudicatory hearing before the agency may take any action at all.

The final two-fold factor of the governmental interest—the public interest in the action sought to be imposed and the administrative burden of providing the additional procedures requested—is also reflected in the flexible due-process analysis we make. *Mathews v. Eldridge, supra,* 424 *U.S.* at 347–48, 96 *S.Ct.* at 908–09, 47 *L.Ed.*2d at 40–41. The public interest in

providing for the care and habilitation of mentally retarded minors is, as we have said, in this State an undeniably strong and solemn commitment. That interest obviously includes assurances that the guardianship needs of these children will be met on a continuing basis, lest their health and welfare languish during the pendency of permanent-guardianship proceedings, or during periods when their parents or legal guardians may be unable or unwilling to discharge their supervisory role. The public interest in providing interim guardianship-of-the-person services is thus unquestionably strong.

On the other side of the equation is the government interest in conserving limited financial, administrative, and judicial resources. We have been informed that one reason the Division chose to adopt the regulations in their present form is that petitioning a court for guardianship of a minor every time parents become temporarily absent would require "massive amounts of legal work" that would prove difficult, time-consuming, and expensive. Such petitions might also frequently be unnecessary, particularly when the parents' absence is temporary rather than permanent.

Given the ease with which parents or legal guardians can forestall all agency action merely by making their presence known; considering the minimal benefits that could be expected through more formal judicial procedures; and in view of the substantive qualifications we place on the agency in Part IV, we see no reason to require formal petitions for interim guardianship whenever a parent or guardian is unavailable to exercise supervisory responsibility for a child already receiving services from the Division.

On balance, the public interest in providing for continuity in meeting the guardianship needs of mentally retarded children, as well as avoidance of the delay and costs involved in requiring court appearances to verify the need for such temporary intervention, outweighs the minimal private benefits that could be expected from more formal proceedings.

Ultimately, the proper balance involves a determination of the point at which "judicial-type procedures must be imposed upon administrative action to assure fairness." *Mathews v. Eldridge, supra,* 424 *U.S.* at 348, 96 *S.Ct.* at 909, 47 *L.Ed.*2d at 41.

> The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances.
>
> * * * All that is necessary is that the procedures be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard," * * * to insure that they are given a meaningful opportunity to present their case.
>
> [*Id.* at 348–49, 96 *S.Ct.* at 909, 47 *L.Ed.*2d at 41 (citations omitted).]

We are confident that the procedures involved under these regulations are fair and narrowly tailored to provide parents and legal guardians ample opportunity to assert their rights prior to the initiation of any agency action. As we view them, the regulations strike an appropriate balance between the private and public interests at stake.

## IV

Our holding today that the Constitution does not require judicial selection of an interim authority to provide guardianship services to mentally retarded minors reflects the fact that this is a challenge to the facial validity of these regulations. We ordinarily accord the agency a presumption of constitutionality in rules promulgated pursuant to law. *Dougherty v. Department of Human Servs.,* 91 *N.J.* 1, 6 (1982). As noted, we could not hold that in every application the regulations would pose a danger of invading a constitutionally protected right—authorizing a child's participation in a field trip is one such innocuous example put before us.

Nevertheless, we share the Public Advocate's concern that in certain factual circumstances the regulations, as currently drafted, could be applied in a manner inconsistent with the procedural safeguards that should be afforded the parents or legal guardians, as well as the children, in any given case. Faced with similar problems in other contexts, this Court has

not hesitated to "engraft a needed meaning" on provisions in order to ensure their constitutionality. *Right to Choose v. Byrne, supra,* 91 *N.J.* at 311 (*quoted in Callen v. Sherman's, Inc., supra,* 92 *N.J.* at 134). Given the current wording of the regulations, we feel compelled to provide some interpretational guidance.

Our initial concern is with the duration of the Division's authority to provide guardianship-of-the-person services. The rules contain no standard for terminating the provision of "interim" services in favor of referring the case for permanent guardianship proceedings, other than the reappearance of a parent or legal guardian, or the child's reaching age 18. Read literally, the rules empower the agency to provide guardianship services indefinitely—at least in the case of a dead or permanently unavailable parent or legal guardian.

Indefinite guardianship services are not, in our view, consistent with the concept of "interim" guardianship services, or with the statutory scheme for permanent guardianship established by the Legislature. The rules should therefore be read in conjunction with the statutory provisions governing the care, custody, and permanent guardianship of dependent or neglected children, *N.J.S.A.* 30:4C–11 to –24. In short, we emphasize that these rules are to be interpreted as authorizing temporary guardianship of the person on the assumption that more lasting arrangements are not needed or during the interim that such arrangements are being made. Once there is significant evidence of the parents' or legal guardian's death or permanent or extended abandonment, proceedings should be initiated for referring the matter to the Division of Youth and Family Services (DYFS) under *N.J.S.A.* 30:4C–11 and –12, toward the goal of permanently settling the situation of these children. This is not to suggest the need for a proceeding to terminate parental rights, but merely to reiterate the need, after a time, for limited judicial involvement in the determination of the need for guardianship and the availability of more preferable family members to fill any guardianship void. We believe that the Division

should wait no more than one year before involving DYFS and the courts.

Related to the durational issue is the Public Advocate's concern with the scope of the Division's power as guardian of the person.

The Advocate asserts that the rules grant the agency blanket authority to make decisions—elective surgery is most prominently mentioned—that may have irreversible consequences not in the best interests of the child. Preliminarily, we note that the Legislature, in the Developmentally Disabled Rights Act, has put certain of these more extreme decisions beyond the authority of even a parent or legal guardian. *See N.J.S.A.* 30:6D–5(a)(4) (guardian *ad litem* and court approval required for shock treatment, psychosurgery, sterilization, or medical, behavioral or pharmacological research). Such decisions are, of course, a far cry from authorizing, for example, the suturing of a lacerated hand. Between those two extremes, however, lie a wide variety of decisions whose potential impact and risk remain, under the current language of the regulations, a matter of conjecture. *See* Note, *Parental Rights and the Habilitation Decision for Mentally Retarded Children*, 94 *Yale L.J.* 1715, 1716–17 (1985) (outlining various important decisions involved in the habilitation decision-making process).

Ordinarily, parents should be the ones to "make critical decisions for the child in such areas as educational services, medical treatment, and social development." *Id.* at 1715; *cf. Smith v. Organization of Foster Families for Equality and Reform*, 431 *U.S.* 816, 861–63, 97 *S.Ct.* 2094, 2118–19, 53 *L.Ed.* 2d 14, 45–47 (1977) (Stewart, J., concurring) (noting primacy of parents over all other caretakers). Nothing in the definition of the role and responsibility of the Division's Bureau of Guardianship Services in *N.J.A.C.* 10:45–1.5 suggests a mandate to substitute its judgment for a parent's in a critical decision-making setting. We believe that a more limited role is contemplated. However, because the possibility of such critical deci-

sion-making is suggested by the broad language of the regulations, we have been requested to address both the substantive and procedural concerns raised by such a possibility. While the concerns may be premature, and we hope overstated, we nonetheless believe such comment is appropriate.

Except in the most emergent of circumstances, critical decisions portending irrevocable consequences for the health or well-being of the minor should be made only after there is clear and convincing evidence, first, that the child's parents are unavailable to participate in the decision, and second, that the requested action is in the best interests of the child. In the case of children admitted to residential services and confined in state or county institutions, the chief executive officers of the institutions are empowered by statute, *N.J.S.A.* 30:4–7.2 and –7.3, to consent to medical, psychiatric, surgical, and dental treatment under specified circumstances. In other contexts, we believe it consistent with legislative intent that determinations critical to the health or well-being of these children be authorized by an independent hearing officer. The DMR conceded before us that the regulations were tailored to those circumstances when it would not be necessary to seek judicial approval of the guardianship decision. We leave it to the agency to develop the appropriate type of hearing process consistent with the range of substantive concerns. *See Heckler v. Campbell,* 461 *U.S.* 458, 467, 103 *S.Ct.* 1952, 1957, 76 *L.Ed.*2d 66, 74 (1983) (Social Security Administration may develop guidelines dispositive of classes of cases without need for specific evidence); *Goss v. Lopez,* 419 *U.S.* 565, 583–84, 95 *S.Ct.* 729, 740–41, 42 *L.Ed.*2d 725, 740 (1975) ("informal give-and-take" all that is required before school administrator could suspend student). Officials within the Division could, for example, serve as the appropriate hearing body with staff from the Bureau of Guardianship Services presenting the case for consideration. *See, e.g., N.J.A.C.* 10:45–1.7 (differences of opinion between guardianship services staff and Division functional-service workers resolved through informal discussion with administrative review by Divi-

sion Director); *see also Goldberg v. Kelly*, 397 *U.S.* 254, 271, 90 *S.Ct.* 1011, 1022, 25 *L.Ed.*2d 287, 301 (1970) (welfare official may act as decision-maker in benefits-termination case provided he was not involved in making the determination under review).

This view is also consistent with the acknowledgment that as the decisions affecting the child become more significant, the private interest at stake, as well as the consequences of error, become more substantial, thereby demanding greater procedural protections.[6] Only for those decisions that might critically and obviously involve the child's future welfare would the Division be expected to seek such adjudicatory authorization.

Finally, since the regulations are premised on the assumption that the parents or guardian will not be available to participate in such a proceeding, we believe the participation of the Public Advocate will help assure a fair determination in the best interests of the child. During oral argument before the Appellate Division, the agency stated its intention, repeated before us, to provide notice to the Public Advocate whenever it intended to initiate interim guardianship-of-the-person services. We believe such a practice, combined with notice of any proposed critical decision-making, will lessen the risks that may exist under the regulations. Within these guidelines, we are satis-

---

[6]We are not suggesting the need for a full, trial-type proceeding to determine the full gamut of circumstances in which, consistent with due process, the agency may exercise parental decision-making prerogatives when parents are unavailable. The agency argued before us that it would "know when to go to court." Some further definition is warranted. As noted, the agency could, consistent with the requirements of due process, articulate in its regulations standards defining the types of decisions it believes can be safely made without the possibility of error or lasting and irreversible consequence to the child. *See, e.g., N.J.A.C.* 10:45–1.5(c)(2) (listing factors that guardianship services staff must consider before consenting to proposed dental or medical procedures, including whether proposed treatment is experimental or irreversible). We believe the agency can articulate detailed standards for appropriate decision-making in this area. *See Department of Labor v. Titan Constr. Co.*, 102 *N.J.* 1, 17–18 (1985) (principles of due process require that agency promulgate regulatory standards to guide substantive decision-making).

fied the Division will exercise its discretion under the rules wisely and in the best interests of the children involved.

## V

For the foregoing reasons, we conclude that the regulations are not defective as beyond the authority of the agency or facially unconstitutional in that their every application will offend the due-process rights of the individuals involved. Any subsequent revision of the rules should be conducted in accordance with the principles expressed in this opinion. As modified, the judgment of the Appellate Division is affirmed.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.