NEW JERSEY ASSOCIATION FOR RETARDED CITIZENS, INC., DAWN DEMASI, A MINOR, BY HER GUARDIAN AD LITEM, FRANK DEMASI AND JAMES LOOMIS, A MINOR, BY HIS GUARDIAN AD LITEM, ELEANORE LOOMIS, PLAINTIFFS, AND BOYCE CLAVERING, A MINOR, BY HIS GUARDIAN AD LITEM, THOMAS CLAVERING AND RICHARD SWAYNE, AN INCOMPETENT BY HIS GUARDIAN, WILLIAM T. J. SWAYNE, AND THE CLASS OF PERSONS SIMILARLY SITUATED WHICH THEY REPRESENT, PLAINTIFFS-APPELLANTS, v. NEW JERSEY DEPARTMENT OF HUMAN SERVICES; ANN KLEIN, COMMISSIONER OF HUMAN SERVICES; MAURICE KOTT, DIRECTOR, DIVISION OF MENTAL RETARDATION, DEPARTMENT OF HUMAN SERVICES; NEW JERSEY DE-PARTMENT OF EDUCATION; NEW JERSEY STATE BOARD OF EDUCATION; FRED G. BURKE, COMMISSIONER OF EDU-CATION; JAMES RICHARDSON, DIRECTOR, BRANCH OF SPECIAL EDUCATION AND PUPIL PERSONNEL SERVICES, DEPARTMENT OF EDUCATION; ALPHONSE C. SOOTKOOS, SUPERINTENDENT, HUNTERDON STATE SCHOOL, DE-FENDANTS-RESPONDENTS.

Argued February 22, 1982—Decided May 13, 1982.

*Stephen Eisdorfer* argued the cause for appellants (*Marilyn J. Morheuser*, Executive Director, Education Law Center, Inc., attorney).

*Steven D. Wallach*, Deputy Attorney General, argued the cause for respondents (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney; *Erminie L. Conley*, Former Assistant Attorney General, of counsel; *Barbara A. Harned*, Deputy Attorney General, on the briefs).

The opinion of the Court was delivered by

PASHMAN, J.

This case concerns the rights and liberties of mentally retarded citizens in public institutions in New Jersey. The parties disagree on the extent of the protection and freedom granted those individuals by state statutes. Today we interpret those statutes to grant mentally retarded children in State facilities the legal right to a thorough and efficient education suited to their individual needs and abilities. We further conclude that all mentally retarded adults in those facilities have the legal right to adequate training, habilitation, education, care and protection in accord with their individual needs. Finally, we hold that all mentally retarded citizens have the right to these services in the setting which is least restrictive of their personal liberty.

## I

### FACTS AND PROCEDURAL HISTORY

Hunterdon State School (Hunterdon) is a residential institution for the mentally retarded. It is operated by the Division of Mental Retardation (Division) of the New Jersey Department of Human Services. At the time of trial in 1979, the Division operated eight such facilities housing almost 8,000 persons. At that time Hunterdon had a population of 988 residents, of whom 412 were school age children and the rest were adults over the age of twenty-one. According to the Division, more than 90% of the Hunterdon residents were severely retarded (IQ score of 20 to 34) or profoundly retarded (IQ score below 20).[1] Their mental ages ranged from one to three years.

Plaintiffs filed suit in the Chancery Division of the Superior Court of Hunterdon County on March 16, 1977. They asserted that numerous federal and state statutory and constitutional

---

[1] This classification system was established by the American Association for Mental Deficiencies.

rights of Hunterdon residents had been violated by defendant state agencies. The residents claimed the right to education and training tailored to their individual needs in the least restrictive setting feasible. At that stage of the litigation, plaintiffs sought both declaratory and injunctive relief to vindicate those rights. On March 10, 1978, the court certified the case as a class action on behalf of all present and future residents of Hunterdon State School.

The court delayed trial several times because defendant agencies were in the process of instituting improvements at Hunterdon to comply with federal standards under the Intermediate Care Facility/Mentally Retarded Program (ICF/MR), a federal medical assistance program which provides matching funds to qualifying states.[2] Federal ICF/MR standards cover physical facilities, staffing, education and habilitation.[3] During this period, defendants were working to meet the physical and space requirements of the federal program by physical renovation and reduction of the population at Hunterdon. More than three hundred new staff positions were to be added to meet staffing standards. Interdisciplinary teams were set up to develop an annual habilitation plan for each resident, to evaluate each resident's needs, to set a series of goals, and to recommend alternate placement where appropriate.

Despite the great improvements made at Hunterdon, plaintiffs decided to proceed with the litigation. Judge Morton Greenberg presided at a non-jury trial in October and November 1979. In an oral opinion on November 16, 1979, he held that

[2]See Title XIX of the Social Security Act, 42 *U.S.C.* § 1396 *et seq.*, and in particular § 1396d(d).

[3]"Habilitation" has been defined as the acquisition and maintenance of "those life skills which enable [residents] to cope more effectively with the demands of [their] own person[s] and of [their] environment and to raise the level of [their] physical, mental, and social efficiency." *Wyatt v. Stickney,* 344 *F.Supp.* 387, 395 (M.D.Ala.1972), aff'd *sub nom. Wyatt v. Aderhold,* 503 *F.2d* 1305 (5th Cir. 1974).

defendants had not violated any of plaintiffs' statutory or constitutional rights. The judge noted that many changes had occurred at Hunterdon since the litigation began. While substantially accepting plaintiffs' description of their legal rights, Judge Greenberg found that at the time of trial defendants were complying with their legal obligations toward the Hunterdon residents. Accordingly, he dismissed the complaint on November 30, 1979.

The Appellate Division affirmed on March 2, 1981, substantially for the reasons stated in the trial court opinion. We granted plaintiffs' petition for certification. 87 *N.J.* 411 (1981).

## II

### AVAILABILITY OF DECLARATORY RELIEF

When this case began in 1977, plaintiffs sought both a declaration of their rights and injunctive relief to enforce them. Between the time the complaint was filed in March 1977 and the time of trial in November 1979 many changes occurred at Hunterdon. The trial was deferred several times as a result. Since the trial in 1979, more changes have been instituted in the staffing, services and number of residents at Hunterdon. The constantly changing factual situation presents us with a "moving record."

At trial, Judge Greenberg properly decided the case on the basis of the facts which existed at that time. Since plaintiffs sought only injunctive relief and not damages of any sort, they had no interest in establishing evidence of the situation two years earlier. All parties directed their attention to the issue of whether defendants were currently complying with their legal obligations toward the Hunterdon residents.

Similarly, at oral argument before this Court, all parties acknowledged that they were concerned only with the current situation in 1982. Because the facts have changed since the trial in 1979, plaintiffs at oral argument before us stated that they

have no current interest in a determination by this Court whether the trial judge adequately set out his factual findings in his opinion or whether those findings were based on sufficient evidence in the record. There is thus no need for us to review the Appellate Division's affirmance of the trial court judgment in this respect.

Plaintiffs do not seek injunctive relief at this time. Rather, they want this Court to decide several disputes between the parties as to the legal obligations of the defendants toward the Hunterdon residents. In effect, plaintiffs seek a declaratory judgment of their rights. We therefore find it unnecessary to consider the Appellate Division affirmance of Judge Greenberg's denial of injunctive relief. We choose to exercise our original jurisdiction to address the uncertainty expressed by the parties with respect to the legal obligations of the defendants toward the Hunterdon residents. *R.* 2:10–5.

We will not render advisory opinions or function in the abstract, *Crescent Park Tenants Ass'n v. Realty Equities Corp. of New York*, 58 *N.J.* 98, 107 (1971); *Friedland v. State*, 149 *N.J.Super.* 483, 495 (Law Div.1977). Nor will we decide a case based on facts which are undeveloped or uncertain, *Burlington Tp. v. Middle Dep't Inspection Agency, Inc.*, 175 *N.J.Super.* 624, 627 (Law Div.1980).

However, we will render declaratory relief when there is an actual dispute between parties who have a sufficient stake in the outcome, *New Jersey Home Builders Ass'n v. Division on Civil Rights*, 81 *N.J.Super.* 243, 251–52 (Ch.Div.1963), aff'd *sub nom. David v. Vesta*, 45 *N.J.* 301 (1965); *Friedland v. State*, 149 *N.J.Super.* at 495; *Young v. Byrne*, 144 *N.J.Super.* 10, 16 (Law Div.1976). We have discretion to issue a declaratory judgment when to do so would be just and fair. *Burlington Tp. v. Middle Dep't Inspection Agency*, 175 *N.J.Super.* at 628.

The Declaratory Judgment Act, *N.J.S.A.* 2A:16–50 to –62, is remedial legislation entitled to liberal construction and

administration, *N.J.S.A.* 2A:16–51; *Union County Board of Chosen Freeholders v. Union County Park Comm'n*, 41 *N.J.* 333 at 336; *Burlington Tp. v. Middle Dep't Inspection Agency, Inc.*, 175 *N.J.Super.* at 628. Its purpose is to end uncertainty about the legal rights and duties of the parties to litigation in controversies which have not yet reached the stage at which the parties seek a coercive remedy. *Union County Bd. of Chosen Freeholders v. Union County Park Comm'n*, 41 *N.J.* at 336; *Hammond v. Doan*, 127 *N.J.Super.* 67, 72 (Law Div.1974). We have held that a declaratory judgment may be rendered under *N.J.S.A.* 2A:16– 53 when there is an actual controversy between the parties which involves differing views on the meaning of applicable statutory provisions, *Union County Bd. of Chosen Freeholders v. Union County Park Comm'n*, 41 *N.J.* at 336; *Burlington Tp. v. Middle Dep't Inspection Agency*, 175 *N.J.Super.* at 628; *Hammond v. Doan*, 127 *N.J.Super.* at 72.

■ Although the facts have shifted since the inception of this litigation, the parties to this case have genuine differences as to their respective rights and duties under various statutes and regulations. They question the proper interpretation of certain regulations and the meaning of several statutory provisions. Moreover, plaintiffs argue that injunctive relief may be unnecessary once this Court has settled the legal controversy between the parties.[4]

Where statutes speak generally, it would be unwise for us to establish specific criteria for implementing them in the absence

[4]It would be ironic and unnecessarily constraining to hold that there is no actual controversy merely because injunctive relief is not sought. The difficulties accompanying wide-ranging judicial involvement in institutions such as Hunterdon have been repeatedly noted by courts and commentators alike, yet such involvement is unavoidable where there is no other way to secure the rights of those affected by such institutions.

Here, a middle ground is proposed. We are asked to elaborate the rights to which plaintiffs are entitled, after which we are hopeful the parties will work together in good faith towards implementing those rights. Thus, coercive and cumbersome judicial involvement will have been avoided.

of a factual context. However, it is appropriate for us to give declaratory relief when the parties differ on interpretations of the relevant statutes and regulations governing their rights and duties.

We therefore hold that plaintiffs are entitled to the requested declaratory judgment.

## III

## THE RIGHTS AND LIBERTIES OF HUNTERDON RESIDENTS

Three sets of rights are in dispute in this appeal: (1) education and training for the children at Hunterdon; (2) habilitation for adult residents at the facility; and (3) provision of these services in the least restrictive setting feasible.

### A. *Education for Children*

The Legislature has expressly granted the children at Hunterdon the right to a thorough and efficient education suited to their individual needs and abilities. The Developmentally Disabled Rights Act of 1977, *N.J.S.A.* 30:6D–1 to –12, *L.*1977, *c.* 82, provides:

Every developmentally disabled person between the ages of 5 and 21, inclusive, in residence or full-time attendance at any facility shall be provided a thorough and efficient education suited to such person's age and abilities. [*N.J.S.A.* 30:6D–5(c)]

*N.J.S.A.* 30:4–25.7 also requires the Department of Human Services to provide for the educational and social needs of those admitted to residential services for the mentally retarded "in accordance with [each] person's individual requirements, as determined by competent professional personnel." Finally, the Legislature has granted all Hunterdon residents a full array of substantive rights including the right to treatment, education, training, rehabilitation, care and protection. *N.J.S.A.* 30:4–165.-2(2). *See also N.J.S.A.* 30:4–165.1; 30:4–23.

■   We hold that these state statutes grant the children at Hunterdon the legal right to treatment, training, habilitation, care and protection, and a thorough and efficient education suited to each child's individual abilities and needs.[5]   *See also* *N.J.A.C.* 10:44–1.2. · In accord with the Developmentally Disabled Rights Act, these services "shall be designed to maximize the developmental potential [of each child] and shall be provided in a humane manner in accordance with generally accepted standards for the delivery of such service[s]..." *N.J.S.A.* 30:6D–9.   Hunterdon is required to establish written individualized plans for each child and to put those plans into effect. *N.J.S.A.* 30:6D–10.

The Public School Education Act of 1975, *L.*1975, *c.* 212, § 39, *N.J.S.A.* 18A:46–9 classifies retarded children for purposes of education as educable, trainable, or eligible for day training.[6] According to the Director of Education at Hunterdon, almost all of the residents at Hunterdon have been classified as "eligible for day training."

---

[5]Because of this holding, we need not reach plaintiffs' claims based on federal statutes.  Nor do we address plaintiffs' constitutional claims.

[6]*N.J.S.A.* 18A:46–9 creates these classifications:

(a) Educable mentally retarded children, who are those who may be expected to succeed with a minimum of supervision in homes and schools and community life and are characterized particularly by reasonable expectation that at maturity they will be capable of vocational and social independence in competitive environment;

(b) Trainable mentally retarded children, who are so retarded that they cannot be classified as educable but are, notwithstanding, potentially capable of self-help, of communicating satisfactorily, or participating in groups, of directing their behavior so as not to be dangerous to themselves or others and of achieving with training some degree of personal independence and social and economic usefulness within sheltered environments;

(c) Children eligible for day training, who are those so severely mentally retarded as to be incapable of giving evidence of understanding and responding in a positive manner to simple directions expressed in the child's primary mode of communication and who cannot in some manner express basic wants and needs.

Whatever doubt may have existed at the time of filing of this complaint as to whether the Public School Education Act of 1975, *L.*1975, *c.* 212 conferred a statutory right to a thorough and efficient education upon children classified as eligible for day training, the subsequent enactment of the State Facilities Education Act of 1979, *L.*1979, *c.* 207, *N.J.S.A.* 18A:7B–1, has erased that doubt. The stated purpose of this bill is

"to provide a thorough and efficient education for children in all State facilities. It applies to educational programs in State schools and day training centers for the mentally retarded, State psychiatric hospitals, State residential youth centers, and State correctional facilities."

The bill provides a procedure for funding these programs. It also requires the Department of Human Services to operate the classes in each facility and assigns responsibility for educational standards.

Pursuant to its statutory obligations to provide education and training to the children in its residential facilities, the Division of Mental Retardation of the Department of Human Services has by regulation adopted the standards promulgated by the State Board of Education regarding class size and minimum hours of instruction. *N.J.A.C.* 10:44–6.2(j). The State Board of Education has adopted minimum standards on class size and ratio of pupils to staff. *N.J.A.C.* 6:28–3.2(d)(1) provides that class sizes for each category of handicapped children should not exceed the following:

v. Mentally retarded, Educable—15 pupils;

vi. Mentally retarded, Eligible for day training—9 pupils per classroom with a pupil/staff ratio of three to one;

vii. Mentally retarded, Trainable—10 pupils.

This regulation clearly mandates that the pupil/staff ratio for all children eligible for day training shall be three-to-one with no more than 9 pupils per classroom.

The regulations of the State Board of Education also mandate that the length of the school day be the same for educationally handicapped pupils as that established for all pupils. *N.J.A.C.* 6:28–3.3. They further provide that:

> A school day shall consist of not less than four hours of actual school work, except that in an approved kindergarten one continuous session of 2½ hours may be considered a full day. [*N.J.A.C.* 6:20–1.3(b) ]

The State argues here that in providing the mandated educational services, Hunterdon should be allowed great flexibility in determining the appropriate criteria. This means that educational programs should be developed without reference to the specific criteria in the regulations.

We find that the Division of Mental Retardation has adopted the State Board of Education regulations and that they apply to the children at Hunterdon. This holding does not deprive the State of flexibility in administering its educational programs for mentally retarded children. We recognize that the severe mental handicaps of the children at Hunterdon mean that some of them are incapable of enduring four hours of formal classroom education. However, education is a flexible concept in this context since the statutes mandate that it be suited to the individual needs and abilities of each child. Under current law, each child at Hunterdon is entitled to four hours per day of structured programming designed to meet his or her educational needs. These educational programs must be structured in the sense that they include a specific content, teaching method and set of objectives. To whatever extent feasible they should meet in a regular time and place.

We also recognize that some of the children may not be capable of handling this level of programming. If that is the case, Hunterdon may make individualized determinations to meet the child's educational needs in another manner. For example, if certain children have attention spans too short to accommodate the standard hours of programming, it may be appropriate to institute training to increase their attention spans. Such decisions will have to be made by competent professional personnel, as mandated by statute. However, we emphasize that a determination to provide less than the mandated four hours per day must be made on an individual basis according to the child's unique needs. We do not propose to

deprive the state of flexibility in providing individualized programs. However, the regulations preclude a decision to provide fewer hours of education on the basis of a generalized determination that four hours is excessive for a class of children at Hunterdon.

To summarize, we hold that each child at Hunterdon has the legal right to education and training suited to his or her individual needs. The State Board of Education regulations on class size, pupil/staff ratio and hours of class time have been adopted by the Division of Mental Retardation and apply to Hunterdon's educational and training program for children. The State has made great efforts in recent years, through both legislative and administrative changes, to improve the quality of education offered to the children at Hunterdon. Plaintiffs acknowledge this to be the case. We expect that the State will continue to make strides toward meeting the ideals set forth in our statutes and regulations.

### B. *Habilitation for Adults*

We next decide whether State law grants adult residents at Hunterdon individual rights to treatment, education and training. It is undisputed that State statutes require the Department of Human Services to provide treatment, education, training, rehabilitation, care and protection to Hunterdon residents. *N.J.S.A.* 30:4–165.1, –165.2(2). However, defendants argue that state law merely obligates them to make these services available at the facility without imposing a duty on them to provide each individual resident with these services.

The Developmentally Disabled Rights Act, *L.*1977, *c.* 82, *N.J.S.A.* 30:6D–1 to –12, provides that the mentally retarded residents at any facility have the same fundamental rights that all other citizens possess and that those rights shall not be abrogated solely because they have been admitted to any facility. *N.J.S.A.* 30:6D–2. These rights include the right not to be starved, *N.J.S.A.* 30:6D–5(b), or beaten, *N.J.S.A.* 30:6D–5(a)(1);

and the right to be free from unnecessary restraint of personal liberty, *N.J.S.A.* 30:6D–5(a)(2), –5(a)(3), or unnecessary or inappropriate medical treatment, *N.J.S.A.* 30:6D–5(a)(3), –5(a)(4).

The act also mandates that mentally retarded residents at any facility be provided with specialized services to which non-handicapped citizens have no legal entitlement. *N.J.S.A.* 30:6D–2, –3(b). These services are intended to alleviate the residents' disabilities and promote their social, personal, physical and economic habilitation. *N.J.S.A.* 30:6D–3(b), –9.

Defendants contend that the Legislature did not intend to grant individual residents the legal right to these specialized services. We cannot agree. Facilities housing developmentally disabled persons are legally required to provide

comprehensive evaluation, functional and guardianship services, as hereafter designated, in order that eligible mentally retarded persons may be provided with adequate training, care and protection. [*N.J.S.A.* 30:4–165.1]

The statute defines residential functional services as including but not limited to "evaluation[,] study, treatment, training, rehabilitation, care and protection..." *N.J.S.A.* 30:4–165.2(2). Can it be that the Legislature intended to require each facility to provide these services but did not require them to be provided to every resident? We think not.

The plain language of the various statutes supports this result. *N.J.S.A.* 30:4–25.7 mandates that the educational services required for mentally retarded residents of any facility "shall [be] provide[d] ... for ... *any such person in accordance with such person's individual requirements*, as determined by competent professional personnel." [emphasis added] The Legislature has declared "that services which are offered to the developmentally disabled shall be provided in a manner which respects the dignity, individuality and constitutional, civil and legal rights of *each developmentally disabled person*..." *N.J.S.A.* 30:6D–2. [emphasis added] Finally, the Legislature has ordered that individualized habilitation plans "be developed and

*placed into effect for each person"* at the facility. *N.J.S.A.* 30:6D–10, –11. [emphasis added]

We conclude that the Legislature did not merely intend these services to be generally available at the facility. The import of these statutes is clear. Hunterdon does not have the freedom to choose which of its residents will receive services and which will not. Every individual at Hunterdon is entitled to these special services not only because it is morally right and just, although it is both those things. They are entitled to them because it is the law.

We have previously recognized the Legislature's strong moral and legal commitment to care for the handicapped. *Levine v. Department of Institutions and Agencies of New Jersey*, 84 *N.J.* 234, 249 (1980). It has not only enacted a bill of rights for the developmentally disabled, *N.J.S.A.* 30:6D–1 to –12, but has vigorously sought to improve the services offered to the mentally handicapped. The record in this case demonstrates that the Departments of Education and Human Services are sincerely attempting to carry out their statutory mandates. State services for residents at Hunterdon have improved dramatically in recent years. Indications are that they will continue to improve. The State deserves great credit for its diligent efforts.

In the absence of a present factual context, we decline to specify the precise amount and nature of the services to which each resident is entitled by the statutes. The broad standards for providing those services are contained in *N.J.S.A.* 30:6D–9. That section provides:

Every service for persons with developmental disabilities offered by any facility shall be designed to maximize the developmental potential of such persons and shall be provided in a humane manner in accordance with generally accepted standards for the delivery of such service and with full recognition and respect for the dignity, individuality and constitutional, civil and legal rights of each person receiving such service, and in a setting and manner which is least restrictive of each person's personal liberty. [*N.J.S.A.* 30:6D–9]

Each resident has the legal right to habilitation in accord with his or her individual requirements as determined by competent professional personnel. *N.J.S.A.* 30:4–25.7. Those services shall

be designed in accord with generally accepted professional standards for the delivery of those services. Most important, the services provided each individual resident shall be designed to maximize his or her developmental potential. *N.J.S.A.* 30:6D–9.

To summarize, we hold that each Hunterdon resident has the individual right to treatment, education, training, habilitation, care and protection. We further conclude that *N.J.S.A.* 30:6D–7 entitles each individual to enforce the right to services elaborated in the statute in an appropriate civil action.

## C. *Least Restrictive Alternative*

There is no dispute that the Developmentally Disabled Rights Act requires services to Hunterdon residents to be provided in "a setting and manner which is least restrictive of each person's personal liberty." *N.J.S.A.* 30:6D–9. The only question is whether the act requires the Department of Human Services to provide a spectrum of settings in which programming can be given to mentally retarded persons. We hold that it does.

State statute explicitly mandates that residential functional services for the mentally retarded

> shall include but need not be limited to: evaluation study, treatment, education, training, rehabilitation, care and protection *in State schools and in other residential facilities operated by the department; family care and sheltered life programs; interim placement in approved residential facilities other than State schools.* Such program may be of short- or long-term duration as required. [*N.J.S.A.* 30:4–165.2(2) (emphasis added) ]

Thus, the Legislature has contemplated that the Department would provide an array of settings within which to provide required services. Moreover, as a practical matter, it is impossible to provide services in the least restrictive setting if only one setting is available. This is common sense.

The public policy behind the least restrictive setting requirement is the assumption that handicapped people are autonomous individuals entitled to the same rights and liberties as all other citizens. When the government sets out to do things which benefit them, it must do so in a way that infringes on their

personal freedom as little as possible. The State must minimize their segregation from society to the extent feasible while providing for their needs.[7]

We emphasize that the decisions on how many people to place in alternative community programs must be based on individualized determinations. Such decisions must take into account the needs of each person as determined by competent professionals. We do not envision widespread movement towards releasing persons such as appellants, leaving them to cope with life alone without the close assistance and supervision they clearly need. Nor do we underestimate the difficulties, the cost or the possible undesirability of moving residents from large schools such as Hunterdon to small community settings. The larger setting may be necessary to provide the concentrated services needed by such persons. However, the right to least restrictive setting means that each resident has a right to an individualized professional determination of the most appropriate setting. As we have stated above, the goal should be to maximize the developmental potential of each person.

We therefore hold that each Hunterdon resident has the legal right to functional services in the setting and manner which is least restrictive of his or her personal liberty. We further hold that this legal right implies a duty on the State to provide a spectrum of possible settings within which to provide such services.

## IV

## CONCLUSION

State statutes grant every child at Hunterdon the legal right to a thorough and efficient education suited to his or her individual needs and abilities. They further grant every Hun-

---

[7]Under current plans, by July 1982 Hunterdon will have transferred over 100 residents into community settings of various types.

terdon resident an enforceable individual right to treatment, education, training, habilitation, care and protection. Finally, the Legislature has mandated that these services be provided in the setting that is least restrictive of each person's personal liberty but still compatible with his or her individual needs.

The services offered to mentally retarded citizens should be provided in a spirit of optimism. The Legislature has declared it the policy of this State to maximize the developmental potential of these citizens while affording them the maximum feasible personal liberty. Like all other citizens, the mentally retarded have the right to pursue happiness. Unlike other citizens, they have unique hurdles to overcome in doing so. Rather than exclude them from the pursuit of happiness, the Legislature has made an effort to include them in our civic community by providing them the special services they need to develop and grow. This public policy affirms our common humanity. Their concerns are our concerns. In this State, we do not set people adrift because they are the victims of misfortune. We take care of each other.

*For grant of relief*—Chief Justice WILENTZ, and Justices PASHMAN, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*Opposed*—None.