243 N.J. Super. 476 (1990)
580 A.2d 272
T.L., PETITIONER-APPELLANT,
v.
DIVISION OF DEVELOPMENTAL DISABILITIES, DEPARTMENT OF HUMAN SERVICES, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 22, 1990.
Decided September 6, 1990.
*477 Before Judges ANTELL, ASHBEY and A.M. STEIN.[1]
Charles W. Dortch, Jr., Assistant Deputy Public Advocate, argued the cause for appellant (Wilfredo Caraballo, Public Advocate, attorney; Charles W. Dortch, on the brief).
Steven Sutkin, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Mary C. Jacobson, Deputy Attorney General, of counsel; Steven Sutkin, on the brief).
The opinion of the court was delivered by ASHBEY, J.A.D.
Petitioner, T.L., appeals from a final determination of the Department of Human Services, Division of Developmental Disabilities (DDD), denying his application for services. We reverse and remand for further proceedings.
*478 Twenty-one year old T.L.'s 1988 application for services appears to be one of the first considered by DDD pursuant to the 1985 Division of Developmental Disabilities Act (Act), N.J.S.A. 30:6D-23 et seq. Effective May 24, 1985, the Act established DDD within the State Department of Human Services to replace the existing Division of Mental Retardation (DMR). Under the Act the Director of the DDD was required within three years to provide services for all eligible developmentally disabled persons by "identifying appropriate programs to meet their needs and by facilitating the establishment of community based services for these persons...." N.J.S.A. 30:6D-27a; see also L. 1985 c. 145, sec. 13 (appended to N.J.S.A. 30:6D-23 historical and statutory notes). While DMR had previously primarily served persons diagnosed as retarded, eligibility for the new Division's services was to be related to the functional result of a mental or physical impairment.[2]
The Act defines a "developmental disability" as:
a severe, chronic disability of a person which: (1) is attributable to a mental or physical impairment or combination of mental or physical impairments; (2) is manifest before age 22; (3) is likely to continue indefinitely; (4) results in substantial functional limitations in three or more of the following areas of major life activity, that is, self-care, receptive and expressive language, learning, mobility, self-direction and capacity for independent living or economic self-sufficiency; and (5) reflects the need for a combination and sequence of special interdisciplinary or generic care, treatment or other services which are of lifelong or extended duration and are individually planned and coordinated. Developmental disability includes but is not limited to severe disabilities attributable to mental retardation, autism, cerebral palsy, epilepsy, spina bifida and other neurological impairments where the above criteria are met. [N.J.S.A. 30:6D-25b].
*479 See also State in Interest of A.B., 214 N.J. Super. 558, 561-562 n. 2, 520 A.2d 783 (App.Div. 1987), aff'd 109 N.J. 195, 536 A.2d 240 (1988).
T.L. applied for DDD to provide him with a sheltered boarding home away from his family. Pursuant to established procedure, DDD intake worker Susan Schaeffer came to T.L.'s house and administered the Critical Adaptive Behaviors Inventory (CABI), the standard DDD test for determining an applicant's level of functioning.[3] She found T.L. had substantial functional limitations in the areas of self-care, language, learning, self-direction and capacity for independent living or economic self-sufficiency, in fact, all six areas of functioning except mobility.[4] Schaeffer recommended T.L. be found eligible for services.
This recommendation was subsequently reviewed by a DDD interdisciplinary team which recommended T.L.'s ineligibility for services, finding no evidence of a "severe" developmental disability of a "chronic, lifelong" nature. The team referred T.L. to his local board of social services for boarding home services. Of the five voting members, two, including Schaeffer, dissented.
Following DDD's Southern Regional Administrator's further determination of ineligibility, another test was scheduled and a *480 second intake worker, Katherine Crawford, administered another CABI to T.L. Between T.L.'s first CABI and his second, the Division changed its procedures so that the intake worker would not complete the CABI, but would take individual recommendations to the team, which would finish the task. In the meantime T.L. was twice hospitalized for seizures.
While Crawford recommended ineligibility, concluding T.L. did not have a chronic or severe disability, she found him functionally limited in learning, self-direction and capacity for independent living or economic self-sufficiency. She also found his limitations possibly due to "social/emotional problems" as opposed to a "developmental disability." A new interdisciplinary team met and recommended ineligibility. A second team of supervisors also recommended ineligibility. The Regional Administrator again concurred. A contested case before the office of Administrative Law (OAL) ensued. Following a hearing before an Administrative Law Judge (ALJ), DDD's director accepted, as his final decision, the ALJ's initial decision recommending that T.L. was ineligible for DDD services.
Certain facts were undisputed. T.L. was born on December 4, 1966. Almost from his entry into school, he was classified as perceptually impaired and emotionally disturbed, with an I.Q. in the borderline to low average range. As an adolescent he had received some vocational training, worked on landscaping and farm crews, assembled typewriter ribbons, done maintenance work for McDonald's and obtained his driver's license. He had attended a sheltered factory workshop from August to December 1987 where his behavior was characterized immature and disruptive. On June 6, 1988, he had suffered the first of the two seizures and since that time had been taking Dilantin. The ALJ found that T.L. had been receiving Supplemental Security Income.[5]
*481 At trial Susan Schaeffer testified that she continued to believe that T.L. had a substantial functional limitation in language, learning, self-direction and independent living or economic self-sufficiency. She also testified, however, that
one of my reasonings for ... believing he was eligible was his impaired judgement and immature behavior. And as the team met more and more, and I was able to take advantage of other people's expertise and their views, I now understand that that is  or now feel, excuse me, that that's not a developmental disability. An impaired judgement and immature behavior. That's more of an emotional problem and is not  not an emotional problem is not considered a developmental disability. I tried to think of what I would recommend at this point if I was redoing it and I think I would probably defer to the team decision rather than make an opinion myself.
....
I think I am now more aware of the types of clients that are accepted into [the] division which I was not aware of at this time.
Respecting her finding that T.L. was deficient in capacity for learning, self-direction and capacity for independent living or economic self-sufficiency, Katherine Crawford testified that T.L. was unable to count money accurately, unable to explain his disability and unable to explain why the CABI was being administered. Crawford also said that T.L. could not currently administer or understand the concept of refilling his medicine, although he might learn if given proper training and opportunity. She found, as did Schaeffer, that T.L. was not able to tell her what makes a good employee or to understand why he was not able to keep jobs. Crawford separately concluded that T.L. did not exhibit a "severe" or "chronic" disability and that his major life activity limitations might be due to social and emotional difficulties as opposed to a developmental disability. It was her opinion T.L. could function in the community with supervision if he received counseling from a mental health *482 organization, vocational training that would allow him to be competitively employed and tutoring to develop money and budgeting skills. These two intake workers were the only DDD experts who had seen T.L. prior to trial.
DDD's Intake Supervisor for the Southern Regional District, Ralph Case, testified that T.L.'s functional limitations might not be of a lifelong or extended duration because, while his impairment was lifelong, he was unable to sustain employment because of his behavior, not impairment. Case found no evidence that T.L. was functionally limited in his capacity for self-care or self-direction, but that over-protectiveness had smothered his capacity. He said that applicants rejected by DDD could possibly receive services from the Division of Vocational Rehabilitation or the board of social services, but expressed a lack of familiarity with the range of services there provided. Case characterized the discrepancies between the results of the first and second CABIs, as perhaps due to the "novelty of process," or because in the interim the "process" had changed. He said that a finding of "severe" and "chronic" would be the "outcome" of the CABI, but that he disagreed with the scoring of the CABI by the workers. It was Case's conclusion that T.L.'s limitations were due to family problems and that he had attempted to manipulate certain examiners.
Case further said, "[w]e do not have the appropriate mental health services. There's a separate DMH and H [Department of Mental Health and Hospitals]." Case admitted that the relationship between DDD and mental health services had not been "anything to brag about," but concluded that a citizen "labeled as being a ... DDD client, the door gets shut on them." When asked if his statutory interpretation was that of the Division, Case said, "[t]hat is the interpretation of southern region. I can't speak for the Division as a whole."
The DDD psychologist, Dr. Mastellone, opined that T.L. did not have a severe and chronic developmental disability, the CABI was neither a valid nor a reliable instrument to measure *483 functional limitation and that T.L.'s admitted limitations were due to his socio-emotional difficulties along with his attitude and motivational problems.[6] While T.L. had a learning disability, Mastellone said it was not severe. The doctor conceded that T.L. had limitations but "based on our criteria," they did not result from a developmental disability. Dr. Mastellone further said the Department of Developmental Disability was mandated to serve developmental disability clients, clients whose limitations are based on developmental disability not on a mental illness. He said, "the Division of Mental Health and Hospitals is there to serve people with mental illness and emotional problems and there is no sense in ... there being a redundancy." Elsewhere, however, the doctor was clear that T.L. was not denied eligibility because of any mental problems. In his opinion, T.L. should be receiving psychotherapy to assist in alleviating his social and emotional problems.
T.L.'s mother testified that T.L. did chores at home, but was unable to handle money. She prepared his meals. When making any purchase, she had to instruct him as to the amount of change. If left at home by himself, he would leave the house and not return. He would not follow directions unless someone was watching over him. She said that since the summer of 1988 they attended counseling once or twice a week at the community mental health center because he screams and curses at her. T.L. also touched and hugged people in an inappropriate manner.
*484 During the hearings, T.L., 22 years old, testified. When asked what it is to tell a lie, he responded, "it makes your nose grow longer." He gave the cost of a rooming house where he had thought of applying, as $800, but did not know if that was by the week or month. He did not see the room or know if he could cook. He said, "you go use the bathroom or do something but its like go across the street ... get a sandwich or something." T.L. distinguished between jobs where he would work all week and only be paid $15 from jobs at $200 a week, which he would like. Of his seizures, he knew that he lost consciousness and once left the hospital before tests were taken. T.L. took medication every four hours for his seizures, but was unaware of its nature.[7]
Dr. David Bogacki, a psychiatrist, testified that T.L. had minimal insight concerning his difficulties. While he was able to follow simple directions, he had difficulty expressing himself and insufficient vocabulary or communication skills to conduct ordinary business. Bogacki found that T.L. was substantially and functionally limited with a full scale I.Q. of 72. T.L. read at the fourth grade level, spelled at the fifth grade level and had third grade math skills. He had perceptual-motor problems, difficulty in conceptualizing and deficits in intermediate memory. Bogacki found T.L. would never be able to manage his personal finances and would not take his medication independently; had significant limitations for independent living and economic self-sufficiency, having lost rudimentary jobs because of his inability to follow rules. He also found substantial functional limitations in T.L.'s ability for self-care. Overall Bogacki's assessment of T.L.'s emotional condition was that he *485 was oppositional, stubborn, immature, had poor impulse control, could not comply with direction and had difficulty understanding his limitations. Bogacki found T.L.'s low frustration tolerance related to an underlying organic difficulty combined with a ten-year old level of functioning. T.L. required a firm, structured environment as well as strict behavioral programming in order to make his current behavioral problems amenable to change. In statutory terms, Bogacki found that T.L. was in need of interdisciplinary and generic care of lifelong and extended duration, vocational training, counseling, socialization training and adult education and to be trained to live independently.
In the course of Bogacki's testimony, the ALJ asked him where the eligibility line came under the statute, saying, "and does one then in order to draw the line impart to it ... practical questions concerning the services, the availability of services,... the provision of services by various agencies?" The ALJ also inquired whether there was a limitation on what can be offered by DDD in accordance with what is appropriated, and asked, "if the money isn't there, how can they be mandated to provide it?"
Following trial, the ALJ, who expressed familiarity with children classified as eligible for DMR services, advised counsel that, except for a "little bit of a wrinkle concerning the interpretation of the statute with respect to certain conditions," legal discussion would not materially contribute to an understanding of the questions being presented. In order to guide them in preparing a memorandum, the ALJ proffered the question of eligibility of a perceptually impair person who had developed a defense mechanism related to the impairment, followed by anti-social behavior and family conflict (in contrast to the many others who did not develop those other traits).
The ALJ's opinion characterized DDD's witnesses as having been "very candid," having no "ulterior motives," but found that Dr. Bogacki, having been employed by the Public Advocate, *486 shaded his observations toward favoring T.L. The ALJ found that T.L. had a low range to low average intelligence, a perceptual impairment, oppositional disorder and possibly a neurological impairment, but that his behavior, rather than his low intelligence and perceptual impairment, stood in the way of his becoming gainfully employed.[8] That behavior came not from disability but because he had never been given the opportunity or training to grow toward self-care, independent living and economic self-sufficiency. The ALJ found T.L.'s absence of functional disability to have been evidenced by his level of proficiency at vocational school, landscaping and maintenance work and by having obtained a driver's license. T.L. was characterized as highly motivated toward obtaining work and achieving independence, but discouraged by his home environment. The ALJ characterized T.L.'s need as one for strict psychiatric behavioral programming in a structured environment, along with training and social counseling to keep a low-skilled job and being able to live independently.
In the language of the statute, the ALJ concluded T.L. had a combination of mental and physical impairments which were manifested before the age of 22, but any functional disability would not continue for longer than three years if he received help. The ALJ found that T.L. was not severely disabled and that his only functional limitation was in learning. Respecting T.L.'s need for services, the ALJ said there was no difference in the views of the parties except in allocating responsibility, but that it would be inappropriate to place T.L. in housing with persons of subnormal intelligence or persons who do not appear to be normal.
Our power to review the action of the agency is limited.

*487 Although sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency's action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors. [The Matter of Petitions for Rulemaking, N.J.A.C. 10:82-1.2 and 10:84-4.1, 117 N.J. 311, 325, 566 A.2d 1154 (1989)].
In his final decision the Director of DDD adopted the ALJ's finding that T.L. failed to establish three substantial functional limitations. Therefore, we first examine the ALJ's findings of fact respecting those limitations.
Due regard must be given to the superior opportunity of the ALJ to judge credibility, but all factual findings must be based on the record. Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 92-93, 312 A.2d 497 (1973). The Public Advocate correctly points out there was no evidence that DDD homes served only persons of subnormal intelligence, that T.L. would find living in a supervised setting inappropriate or that T.L. could achieve the self-sufficiency in three years with mental health counseling.
More important, the ALJ's finding that T.L. was able to function in five out of six areas of major life activity does not accord with the findings of any expert. The ALJ's conclusion, that T.L. would be able to manage finances, be self-directed or live independently if he had not been overprotected, was contradicted by an unbroken school record demonstrating mathematical and conceptual impairment. While Case and Mastellone questioned the CABI results, neither testified affirmatively T.L. was not limited in three major life activity areas. Each asserted primarily that T.L.'s developmental disability was not "severe" or "chronic" or caused by mental or physical impairment, reasons to reject T.L.'s application quite different from concluding he was not functionally limited. We are satisfied that the ALJ's finding that T.L. was functionally limited only in the area *488 of learning is not supported in the record. See Petitions for Rulemaking, 117 N.J. at 325, 566 A.2d 1154.
This conclusion, however, does not end the matter. The ALJ's initial decision, which was accepted by the Director of DDD, also adopted the opinions of Case and Mastellone that T.L. was not eligible for services because his disability was not caused by mental or physical impairment, was not "chronic" and was not "severe." The Public Advocate urges that the application of these standards is not supported by the legislation, and that where an applicant demonstrates substantial functional limitation in three or more areas of major life activity, his disability is necessarily "severe." If an applicant further demonstrates that his disability is likely to continue indefinitely, his disability is necessarily "chronic." On appeal DDD urges that such an interpretation would make irrelevant the statutory language that the disability be severe and chronic as well as demonstrated by functional limitation. We agree that we cannot assume that the Legislature used meaningless language. Passaic v. Local Fin. Bd., Commun. Aff., Etc., 88 N.J. 293, 298, 441 A.2d 736 (1982). We also note, however, that DDD personnel made no effort to give further meaning to the language in question.
At issue is legislative intent. The statute offers no definition of some of its vital terms. Webster's Second Edition New Universal Unabridged Dictionary, at 322 (1983), gives the following definition for "chronic." "1. perpetual, habitual, constant; 2. continuing a long time; also, recurring, as a disease; 3. having had an ailment or habit for a long time." Under any definition of "chronic" it would be hard to imagine a more lifelong impairment than T.L.'s. While the question of his ability to function as an independent adult was recent, his functional limitations and resulting disability were long-standing, *489 and the record does not support a contrary conclusion.[9]
Whether T.L.'s limitations caused a "severe" disability presents a greater problem. Webster's Second Edition New Universal Unabridged Dictionary, at 1662, defines "severe" as: "1. harsh or strict, as in treatment; unsparing; stern; 2. serious; grave; forbidding, as in expression or manner; 3. conforming strictly to a rule, method, standard, etc. rigidly accurate; 4. extremely plain or simple; unornamented; restrained; said of style, as, a dress with severe lines." The inappropriateness of this definition persuades us that legislative intent expressed in the word "severe" is not plain, requiring us to explore legislative history.
New Jersey has a "strong commitment to providing care for the mentally handicapped." See N.J. Ass'n for Retarded Citizens v. Human Services, 89 N.J. 234, 249, 445 A.2d 704 (1982), quoted in In re Promulgation of Guardianship Services Reg., 103 N.J. 619, 626, 512 A.2d 453 (1986). N.J.S.A. 30:6D-23 et seq. stems from federal legislation, part of an ongoing effort by concerned citizens to provide services to the handicapped, beginning with children and their education.[10] "Federal involvement in state provision of health care to those persons with developmental disabilities began in 1963 with passage of the Mental Retardation Facilities Construction Act, Pub L 88-164, 77 Stat 282." Pennhurst State School v. Halderman, 451 U.S. 1, 37, 101 S.Ct. 1531, 1550, 67 L.Ed.2d 694, 720 (1981). Appointed after the Federal Developmental Disabilities Services and Facilities *490 Construction Amendments of 1970, Public Law 91-517, 84 Stat. 1316, sec. 207, the New Jersey Developmental Disabilities Council, which began as the Mental Retardation Planning Board, was the moving force behind the passage of the 1985 Act. Twentieth Anniversary Report of the New Jersey Developmental Disabilities Council (1989), at 23. The work of the council is thus relevant in understanding legislative intent, including the three-year time period given to develop DDD. See N.J.S.A. 30:6D-23 (Senate Committee statement appended thereto).
After the passage of N.J.S.A. 30:6D-23 et seq., and during the ensuing three years experts worked on redirecting DMR's goals in "project redirection," an admittedly monumental task, performed by the Council in cooperation with the University affiliated program of the University of Medicine and Dentistry of the New Jersey Wood Johnson Medical School and DDD.[11] Their final report, Hands On, combined with the absence of DDD regulations some four years after the Act's passage, makes it clear that the Act's implementation remains a difficult task.[12]Ibid.
N.J.A.C. 10:46-1.1 et seq. still refers to the "mentally retarded."[13] In 20 N.J.R. 2008, Aug 15, 1988, the Division proposed *491 new rules and a repeal of the old rules concerning determination of eligibility for mental retardation services (proposed N.J.A.C. 10:46 under N.J.S.A. 30:4-25.1; 30:4-25.2; -.3; -.4; -.6; 30:6D-1 et seq., 30:6D-23 et seq. especially -32). There the Division noted in its statement accompanying the proposed regulation that the 1985 Act charged the Division with the responsibility to develop new criteria.
It is estimated that there are approximately 101,000 developmental disabled people in the State of New Jersey. Of these, approximately 7,000 may be eligible for the services of the Division, and, of these the Division expects that approximately 2,300 may apply. The Division has received approximately 750 applications for services from people who may be eligible.... Of the 750 applications 99 have been reviewed closely and 74 of the 99 appear to meet the proposed criteria.
Social Impact:
The proposed new rules will benefit that group of individuals who have not previously been served by the Division of Developmental Disabilities by setting forth specific criteria that will provide them with procedures by which they may receive services.... The rules will benefit Division staff responsible for making initial determinations of eligibility by providing standards to guide their determinations.
Economic Impact:
....
The legislature has appropriated $2.3 million for the 1989 Fiscal Year to cover costs associated with the proposal. [20 N.J.R. 2008]
These proposed regulations repeated the statutory criteria for service eligibility.
DDD's next proposed regulations were published on December 4, 1989. See 21 N.J.R. 3712. The Division there said in its accompanying statement that the proposed eligibility criteria at 20 N.J.R. 2008(a) attracted so much comment that the proposal had been withdrawn. The new proposed regulations provided *492 that no "mental or physical impairment," underpinning a developmental disability, could be based on mental illness.
Mental illness was defined as "current substantial disturbance of thought, mood, perception or orientation which significantly impairs judgement, behavior or capacity to recognize reality but does not include simple alcohol intoxication, transitory reaction to drug ingestion, organic brain syndrome or developmental disability. (P.L. 1987, c. 116 [N.J.S.A. 30:4-27.2r])."[14]N.J.R. 3713 (Proposed N.J.A.C. 10:46-1.3). The proposed mental illness exclusion, including any attitude impairing behavior, unless caused by a "developmental disability," is obviously circular. This circularity is continued in the definition of "mental or physical impairment," defined as "impairment in cognitive, neurological, sensory, cerebral or motor functioning resulting from other than mental illness." Ibid.[15] As in the earlier proposed regulations, nothing in these proposed regulations further defined the meaning of "chronic" or "severe," or limited eligibility beyond statutory language, other than for mental illness.
We have earlier referred to the genesis of the 1985 Act as federal. There are federal precedents as guides to statutory interpretation. The Social Security law defines "disability" as:

*493 the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to ... last for a continuous period of not less than 12 months. To meet this definition, you must have a severe impairment.... [20 C.F.R. sec. 404.1505(a); emphasis added]
Federal regulations define the meaning of "severe" in this context by defining when an impairment is not "severe."
(a) ... An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
(b) ... When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include 
(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting. [20 C.F.R. sec. 404.1521]
The United States Supreme Court has interpreted these regulations, see also 20 C.F.R. sec. 416.920, with one Justice noting that a restrictive administrative interpretation of the meaning of "severe" impairment had historically and wrongfully excluded qualified applicants for Social Security disability benefits. Bowen v. Yuckert, 482 U.S. 137, 156-157, 107 S.Ct. 2287, 2298-2299, 96 L.Ed.2d 119, 136 (1987) (O'Connor, J. concurring). In Bowen v. Yuckert, over dissenting opinions, Justice Powell, for the majority, ruled that the "severity regulation" was not excessively vague because, as further defined, a "severe" impairment must "significantly limit... physical or mental ability to do basic work activities." Id. at 153, 107 S.Ct. at 2297, 96 L.Ed.2d at 134 n. 11, quoting 20 C.F.R. sec. 404.1520(c).
While neither the holding of that case nor the resolution of its underlying statutory question applies to T.L.'s rejection, it is clear that the word, "severe" has been given content in a similar regulatory setting respecting economic self-sufficiency. Applying that particularized standard to T.L., it was undisputed that T.L. could not carry out or remember instructions at work, *494 use judgment or respond appropriately to supervision or co-workers.
We also cannot avoid a disquieting sense in this case of another parallel to the federal experience. In the "History of Redirection" section of Hands On, the project directors observed,
The old Division of Mental Retardation was frequently criticized for "door keeping," for using eligibility criteria to deny services, rather than accepting persons with mental retardation who were having trouble functioning and had come to the attention of other agencies. Without considering the justice of the accusation  Division staff were applying legally mandated requirements  it is sufficient to note that this change in the legal mandate should prevent these conflicts.
There is an implication from the testimony in this case that, despite the best of intentions and hard work by DDD workers, the Council and others, the "legal mandate" has not yet been implemented in the way the authors of Hands On predicted.
"Agencies have the broadest power in determining how to allocate available resources." In the Matter of Petitions for Rulemaking, N.J.A.C. 10:82-1.2 and 10:85-4.1, 117 N.J. 311, 325, 566 A.2d 1154 (1989). Providing services to the developmentally disabled is expensive. The April 24, 1985 news release of the Governor said that 2,300 more persons would be eligible for DDD services and that this expansion of service would cost $9.5 million over five years, to be drawn from existing departmental allocation and to attract an estimated $4 million federal aid.
Financial services to the disabled are supported in part by federal monetary grants. Some of the figures respecting those grants, while not current, illustrate the enormity of the fiscal ramifications of expanding eligibility for services. During fiscal year 1980 $98 million (rounding off in millions) in Federal Title XX funds was allocated to the State. The total State match was $19 million, while local funds totalled $16 million. Of that sum DMR received $3 million Federal money with a State match of $1 million. (The Division of Vocational Rehabilitation received $640,000 of State and Federal money) The total *495 included $6 million in Federal Title XX and State funds allocated to programs for the developmentally disabled. Appendix to the New Jersey 1981 State Plan for Services to the Developmentally Disabled, at 51, 53.
Thus, the ALJ (hence DDD) was understandably concerned about the cost of the program for which T.L. had applied. We must, however, be guided by the statute, its language where plain, and its reasonable meaning where ambiguous. See Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 128, 527 A.2d 1368 (1987); Mortimer v. Board of Review, 99 N.J. 393, 398, 493 A.2d 1 (1985). Under the Act, the [D]irector was to provide services to those eligible; "except that if the most appropriate services ... [were] not immediately available, the [D]irector may provide an eligible ... person with alternate services...." N.J.S.A. 30:6D-27a. Rather than reject otherwise eligible persons because another agency was deemed responsible, the Director was required to "[e]stablish liaison and cooperative agreements with other governmental departments and agencies which provide programs and services to the developmentally disabled to prevent duplication of services and encourage a continuum of care that is required by persons with developmental disabilities." N.J.S.A. 30:6D-27c. The drafters of the Act also said that applicants were not to be rejected as ineligible for fiscal reasons.[16] The extent to which DDD, or any other division of the Department of Human Services, is unable to provide specific services for financial reasons may be regarded as a separate question.
In Metromedia, Inc. v. Director, Division of Taxation, 97 N.J. 313, 478 A.2d 742 (1984), the Court established six factors for determining what agency action constitutes an administrative rule, namely, when the determination

*496 (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. [Id. at 331-32, 478 A.2d 742]
See also In re Promulgation of Guardianship Services Reg., 103 N.J. at 642 n. 6, 512 A.2d 453.
The Act required DDD to apply new criteria to applications for services to the "developmentally disabled," an admittedly imprecise term. If one accepts the testimony of testifying DDD representatives, either DDD eligibility standards depended on the regional location of the applicant, or were based on DDD's statutory interpretation. We cannot escape the conclusion that, in determining the legal rights of T.L., one of its first cases, DDD intended its procedures to have lasting effect. From the record, we believe the eligibility standards that DDD applied to T.L.'s application were
(1) that functional limitations qualifying the applicant had to be primarily caused by irremediable mental or physical impairment, exclusive of social and emotional factors;[17]
(2) that "chronic" disability meant more than functional inadequacy existing since school entry;
3. that "severe" disability meant more than inability to function adequately in three areas of major life activity.
The use of each such standard appears to us similar to that of the taxing authority using a novel "audience-share" factor to determine the taxability of the broadcast business. Metromedia, 97 N.J. at 334, 478 A.2d 742 and, therefore, rule-making. If the views of Division personnel did not represent the application of accepted DDD standards, they certainly "implicate[d] *497 matters of administrative policy...." 613 Corp. v. State, Div. of State Lottery, 210 N.J. Super. 485, 499, 510 A.2d 103 (App. Div. 1986).
DDD's exclusive process of review of applications was found by the ALJ to be evidence that its decision was sound and not arbitrary. Our examination of the opinions expressed by those who took part suggests otherwise. A review process in which decisionmakers apply unspecified policy is not made more adequate by the proliferation of layers.
We do not suggest that DDD may not codify standards. There was testimony that any negative response on any one of the seven specific CABI inventory questions per area of major life activity impelled a finding that the applicant could not function in that area. It may be entirely appropriate for DDD to implement its position that a "severe" impairment requires more than an applicant's being unable to function in three major life activities as defined. The implication of the testimony of the Division experts was that some negative responses were not as important as others, as well as that negative responses recorded by the intake worker should be rejected where the team disagreed with the intake worker's findings. If the issue is credibility, however, it is hard to understand how the complicated review process by persons not observing the applicant could justify a conclusion contrary to that of the intake worker. If the issue is DDD's use of new and additional rejection criteria, there should be a rule promulgated to that effect, with appropriate rule-making safeguards. We cannot, however, find support for DDD's rejection of T.L.'s application based upon medical descriptions of his impairment, lack of DDD facilities (or their purported presence in another department), or social/emotional impairment causation, given his acknowledged impairment and lack of function in critical areas of major life activity.
The final determination of DDD that T.L. was not eligible for services as developmentally disabled is accordingly reversed and the matter remanded for a new hearing.
NOTES
[1] Judge Antell was not present at oral argument but participates in this appeal with the consent of the parties.
[2] The Senate Institutions, Health and Welfare Committee Statement appended to Senate Bill No. 1826, June 18, 1984, said that the State Developmental Disabilities Council estimated there were approximately 88,000 developmentally disabled persons in the State and the Division of Mental Retardation then served some 13,000. See N.J.S.A. 30:6D-23 (Senate Committee statement appended thereto). The Council estimated that when DDD replaced DMR, an additional 2,300 persons would apply for and be eligible for services.
[3] The CABI divides each of the areas of major life activity into specific inquiries concerning the applicant's ability to function in daily life.
[4] Throughout the record DDD personnel referred to six areas of major life activity. 42 U.S.C.A. sec. 6001(5)(D), the predecessor and prototype for the New Jersey statute, lists seven areas of major life activity: "(i) self-care, (ii) receptive and expressive language, (iii) learning, (iv) mobility, (v) self-direction, (vi) capacity for independent living, and (vii) economic self-sufficiency." See also The New Jersey State Plan for Services to Persons with Developmental Disabilities  1985 Update, at 1; and New Jersey State Plan for Services to Persons with Developmental Disabilities 1984-1986, at 3. Being able to live alone and being able to support oneself were testified to as quite different life activity skills. Where eligibility depends on qualifying in three areas, such a dichotomy is relevant.
[5] The Supplemental Security Income program administered by the United States Department of Health and Human Services through Social Security district offices provides financial assistance to the disabled. Eligibility is contingent upon a disability determination. See 42 U.S.C.A. sec. 1382c. No relationship between this disability determination and that of the DDD was referred to at trial.
[6] DDD's challenge to the validity of the CABI ran counter to its extensive history. The 1989 Twentieth Anniversary Report of the New Jersey Developmental Disabilities Council, at 24, noted that the CABI was a great step forward. "[T]he CABI should be regarded as a contribution to the state of the art." Hands On, Final Report for Project Redirection (sometimes referred to as Hands On), "Introduction," prepared by the New Jersey Developmental Disabilities Council in Cooperation with the University Affiliated Program of the University of Medicine and Dentistry of New Jersey Wood Johnson Medical School and the Division of Developmental Disabilities, New Jersey Department of Human Services (1988) (unpaginated).
[7] Both the ALJ and DDD personnel dismissed T.L.'s recent seizures as unimportant. But see Redirection of the Division of Mental Retardation to a Division of Developmental Disabilities, the Report of the New Jersey Developmental Disabilities Council (December 1, 1982), at 3, which noted that the Social Security Administration had indicated that one-half of all institutionalized mentally retarded persons (in a survey of adults disabled in childhood who were receiving Social Security benefits) had a seizure disorder.
[8] In contrast to Case's reference to T.L.'s "manipulation" of examiners, the ALJ appeared to agree with Bogacki that T.L.'s apparent refusal to perform requested tasks was related to his embarrassment caused by his inability to function rather than attempted manipulation.
[9] "Certain Unalienable Rights," The Final Report of the Governor's Task Force on Services for Disabled Persons (April 1987), at 4, suggests that one of the most difficult interpretive problems concerning an acceptable definition of "disability" was that poor definitions did not "clearly distinguish between more or less permanent deficits and temporary illness." The juxtaposition of "temporary" with the earlier "lifelong" qualifier may be relevant. Compare N.J.S.A. 30:6D-25b with N.J.A.C. 10:46-1.4.
[10] For a full exposition on the related Federal 1975 Education For All Handicapped Children Act (EAHCA), 20 U.S.C.A. secs. 1401-61, see Lascari v. Bd. of Educ. of Ramapo Hills, 116 N.J. 30, 33-37, 560 A.2d 1180 (1989).
[11] Not all of the `redirection' apparently applied to the Division. The Council itself has recently been expanded to "include a greater mix of persons with a wide variety of disabilities and parent advocates." The Star-Ledger, June 29, 1990, at 36.
[12] The "History of Redirection" section of Hands On reports that other states have developed disability service procedures on the basis of the mental retardation system, without radical change, and "[f]or this reason, several other states are following developments in New Jersey to determine the feasibility of `redirecting' their new developmental disabilities systems in similar ways."
[13] These regulations provide that eligibility requirements include "[t]hat the person meets established psychometric criteria," with reduction in social competence, existing prior to adolescence, and reasonably expected to be of "life duration." Any applicant must be found to require the functional services of the Division at the time of application. N.J.A.C. 10:46-1.4. Unlike every other chapter in Title 10 (the Department of Human Services Regulations, Subtitle H, Division of Developmental Disabilities), Chapter 10:46, "Application and Admission to Functional Services" contains no expiration date. 10 N.J.A.C. Subtitle H, as supplemented February 20, 1990.
[14] L. 1987, c. 116, of which N.J.S.A. 30:4-27.2r is a part, revised the law governing involuntary civil commitment to psychiatric facilities. These definitions apply to those retarded persons so "mentally deficient" as to require guardianship services. See N.J.S.A. 30:4-25.1, applicable to all of Title 30; N.J.S.A. 30:4-25.1a, redefines "mental retardation."
[15] In the Department of Human Services' regulations concerning groups targeted for mental health services (as opposed to developmental disability) services, "[m]entally impaired" defines "a person whose primary impairment is emotional, excluding those whose primary problem is a developmental disability, retardation, and/or organic brain syndrome." N.J.A.C. 10:37-5.2(b)4iii(1). "Functionally impaired" is defined as "having serious functional problems in personal, interpersonal, and/or social skill areas." Id. at (2). Compare N.J.S.A. 30:6D-25b, providing that an eligible developmental "disability [may be] ... attributable to mental ... impairment...." (Emphasis added.)
[16] See Hands On, "The History of Redirection." "Eligibility is not tied to the availability of appropriate services. The Division recognizes that some needed services for persons with disabilities do not exist. The Service Assessment teams have a role in assessing service gaps and developing programs to address them."
[17] DDD did not suggest that T.L.'s application accorded with any proposed "mental illness" exception.