661 A.2d 1277

STATE OF NEW JERSEY IN THE INTEREST
OF R.M., A JUVENILE.

Argued January 3, 1995—Decided August 7, 1995.

438

*Claudia Van Wyk,* Deputy Public Defender, II, argued the cause for appellant, R.M. (*Susan L. Reisner,* Public .Defender, attorney).

*Steven E. Braun,* Senior Assistant Prosecutor, argued the cause for respondent, State of New Jersey (*Ronald S. Fava,* Passaic County Prosecutor, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney).

The opinion of the Court was delivered by

HANDLER, J.

In this case, a delinquent juvenile was sentenced to a term of incarceration which, on appeal, he contends was illegal. That contention requires the Court to consider the substantive and procedural standards to be applied in determining whether a delinquent juvenile is developmentally disabled for the purposes of the Code of Juvenile Justice. The issue is important because a juvenile who is developmentally disabled cannot be incarcerated for delinquency.

I

The Code of Juvenile Justice prohibits the incarceration of a juvenile who is developmentally disabled. *N.J.S.A.* 2A:4A–44c(2). That statutory prohibition is invoked in this case by a juvenile, R.M., who was sentenced to a term of incarceration for offenses committed on February 24, 1993.

On that day, R.M. approached a passenger on a train and asked him if he had any change. When the passenger stated that he did not, R.M. displayed a large hunting knife that he wore on his waistband. The passenger showed R.M. that he only had three one-dollar coins, two quarters, a nickel, and a few pennies. R.M. next asked to see what was in the passenger's bag, and the passenger showed R.M. that the bag contained only magazines.

The passenger then gave R.M. the change. According to the victim, as the train pulled into the station, "[R.M.] informed me that this was my stop. When I arrived at my home, the police called me telling me they had apprehended the man. They took me to Hoboken station where I identified the man."

R.M. was charged in the Family Part of the Chancery Division of the Superior Court (hereinafter sometimes referred to as the "family court") with acts that, if committed by an adult, would constitute first degree robbery, in violation of *N.J.S.A.* 2C:15–1, third degree possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4d, which was later amended to fourth degree unlawful possession of a weapon, in violation of *N.J.S.A.* 2C:39–5, and receiving stolen property, in violation of *N.J.S.A.* 2C:20–7.

The State agreed to withdraw its motion seeking the waiver of juvenile court jurisdiction and the transfer of the prosecution to the adult court in return for R.M.'s admission to acts that constituted robbery and possession of a weapon. R.M. admitted that he possessed a knife and committed a robbery with that knife. The family court accepted the plea and the withdrawal of the waiver motion, and dismissed the remaining charges.

At the dispositional hearing, evidence was presented on mitigating and aggravating factors. Defense counsel did not argue, however, that R.M. was developmentally disabled. After considering the evidence, the court sentenced R.M. to four years' incarceration in Jamesburg. Additionally, following defense counsel's recommendation, the court ordered immediate psychiatric assistance, including medication if necessary, as well as the continued involvement of the Division of Youth and Family Services (DYFS). The court stated that the involvement of DYFS was necessary to implement the "re-entry program" proposed by defense counsel. Finally, the court retained jurisdiction, requiring that no placement occur without prior court approval.

R.M. filed an appeal limited to the excessiveness of the sentence pursuant to *Rule* 2:9–11. The arguments on the appeal focused on

the question of whether the evidence adduced at the dispositional hearing demonstrated that R.M. was developmentally disabled, and therefore not subject to incarceration. The Appellate Division determined that "[i]t has not been established that defendant is developmentally disabled," and, noting further that "[t]his issue was not raised in the trial court," concluded that "the record is not sufficiently developed" to warrant a finding of developmental disability. Accordingly, it affirmed the judgment of the trial court.

We granted the juvenile's petition for certification. 137 *N.J.* 166 (1994).

## II

The provision exempting developmentally-disabled juveniles from incarceration, *N.J.S.A.* 2A:4A–44c(2), was included in the Code of Juvenile Justice (Code) that was passed in 1982. *L.*1982, *c.* 77; *N.J.S.A.* 2A:4A–20 to –49. That provision states that "[t]he following juveniles shall not be committed to a State correctional facility: ... (2) Juveniles who are developmentally disabled as defined in paragraph (1) of subsection a. of section 3 of P.L.1977, c. 82 (C. 30:6D–3a(1))."

The reference in the Juvenile Code to paragraph 3a(1) of the 1977 law introduces some ambiguity into the question of the definition of developmental disability, because substantial amendments to the statutory definition of developmental disability were enacted after the passage of the Juvenile Code provision barring the incarceration of developmentally-disabled juveniles. Thus, paragraph 3a(1) of the current statute reflecting those amendments contains only a small part of the present definition of developmental disability. The earlier statute, *L.*1977, *c.* 82, § 3a; *N.J.S.A.* 30:6D–3a (since amended), presented a much larger part of the definition in its paragraph (1). It defined a developmental disability to mean a disability of a person which

(1) is attributable to:

(a) mental retardation, cerebral palsy, epilepsy or autism;

(b) any other condition found to be closely related to mental retardation because such condition results in impairment of general intellectual functioning or adaptive behavior similar to impairment resulting from mental retardation or which requires treatment and services similar to those required for mental retardation; or

(c) dyslexia resulting from a disability described in subparagraphs (a) and (b);

(2) originates before such person attains age 18;

(3) has continued or can be expected to continue indefinitely; and

(4) constitutes a substantial handicap to such person's ability to function normally in society[.]

[former *N.J.S.A.* 30:6D–3a.]

In 1985, the Legislature enacted the Division of Developmental Disabilities Act. *L.*1985, *c.* 145; *N.J.S.A.* 30:6D–23 to –32. That Act amended the definition of developmental disability to read as follows:

a. "Developmental disability" means a severe, chronic disability of a person which:

(1) is attributable to a mental or physical impairment or combination of mental or physical impairments;

(2) is manifest before age 22;

(3) is likely to continue indefinitely;

(4) results in substantial functional limitations in three or more of the following areas of major life activity, that is, self-care, receptive and expressive language, learning, mobility, self-direction and capacity for independent living or economic self-sufficiency; and

(5) reflects the need for a combination and sequence of special inter-disciplinary or generic care, treatment or other services which are of lifelong or extended duration and are individually planned and coordinated. Developmental disability includes but is not limited to severe disabilities attributable to mental retardation, autism, cerebral palsy, epilepsy, spina bifida and other neurological impairments where the above criteria are met[.]

[*L.*1985, *c.* 145, § 12; *N.J.S.A.* 30:6D–3.]

Paragraph 3a(1) of the present statute, thus, contains only one of the series of conditions that, together, constitute developmental disability.

Two issues of interpretation are posed by this sequence of statutory definitions. First, we must decide whether to continue to use the old definition of developmental disability in its entirety. Second, if we decide not to do so, we must decide whether to use the new definition in its entirety, or instead use only that small portion of the definition contained in the present version of paragraph 3a(1).

[1] In resolving the first question, we are guided by the rule of statutory construction governing references to revised statutes, N.J.S.A. 1:1–3.3. That rule provides that

[a]ny reference in any statute to any other statute, which is revised by a revision law, shall, after the effective date of such revision law, be construed to be a reference to the section or sections, if any, of the revision law corresponding in substance to, or superseding, the section or sections of the statute so revised and so referred to.

Applying that rule of construction, we construe N.J.S.A. 2A:4A–44c(2) to refer to N.J.S.A. 30:6D–3a as amended in 1985 to the extent that the later definition "corresponds in substance to" the earlier definition.

The second question relates to the extent of inclusion of the new definition's terms within the reference of the anti-incarceration provision. As noted, N.J.S.A. 2A:4A–44c(2), when enacted in 1982, referred only to that portion of the definition of developmental disability contained in paragraph (1) of subsection a. of section 3 of the 1977 law. A substantial part of the definition that was previously contained in paragraph (1) was transferred by the 1985 amendment to other paragraphs, most notably paragraphs (4) and (5). We must decide, thus, which section or sections of N.J.S.A. 30:6D–3a, as it now reads, correspond in substance to, or supersede, N.J.S.A. 30:6D–3a(1) as it read in 1982.

Subsection (b) of paragraph (1) of the 1977 statute described a developmental disability as a condition "which requires treatment and services similar to those required for mental retardation[.]" Paragraph (5) of the 1985 statute contains the analogous provision: "a combination and sequence of special inter-disciplinary or generic care, treatment or other services which are of lifelong or extended duration and are individually planned and coordinated." Thus, the current paragraph (5) essentially describes in greater detail the "treatment and services" that persons with developmental disabilities require, thereby corresponding in substance to the earlier statute. Further, paragraph (5), as it now reads, lists some sources of developmental disability, including mental retardation, autism, cerebral palsy, epilepsy and spina bifida. All but the last

of these were referred to in subsection (a) of paragraph (1) of the former statute as conditions to which developmental disabilities may be attributable.

Paragraph (4) of the current definition likewise corresponds to a portion of the former paragraph (1). Paragraph (4) describes a developmental disability as one that "results in substantial functional limitations in three or more ... areas of major life activity...." Subsection (b) of paragraph (1) of the former definition identified developmental disability as a condition that "results in impairment of general intellectual functioning or adaptive behavior similar to impairment resulting from mental retardation...." Paragraph (4) therefore can be seen as elaborating on the "impairment" referred to in the original statute and as replacing a focus on medical diagnosis with a focus on functional limitations.

The current paragraph (3) specifies that a genuine developmental disability must be likely to continue indefinitely. That condition bears a strong resemblance to that found in former paragraph (3). Because the former paragraph (3) was not included in the reference in the anti-incarceration provision, the current paragraph (3), in itself, likewise is not included. However, inclusion of current paragraph (3) would be redundant in any case inasmuch as current subsection a., which clearly is included in the reference, expressly specifies that the disability be chronic. Thus, the requirement contained in paragraph (3) that the condition be likely to continue indefinitely remains relevant insofar as it explains the meaning of the term "chronic." We note, finally, that current paragraph (2) need not be incorporated in the definition. Because *N.J.S.A.* 2A:4A–44c(2) prohibits the incarceration of juveniles who are developmentally disabled, that paragraph's requirement that the disability manifest itself before age twenty-two is superfluous in this context.

■ We thus determine from a comparative analysis of the 1977 and 1985 statutes that paragraphs (1), (4) and (5) of the current enactment correspond substantially to the former definition, and all were intended to be used in the assessment of whether a

juvenile is developmentally disabled within the meaning of
*N.J.S.A.* 2A:4A–44c(2). *See State in the Interest of A.B.*, 214
*N.J.Super.* 558, 561–62 n. 2, 520 *A.2d* 783 (App.Div.1987) (conclùd-
ing that *N.J.S.A.* 2A:4A–44c should be construed to incorporate
*N.J.S.A.* 30:6D–3a as amended in 1985, and, further, that "the part
of *N.J.S.A.* 30:6D–3a 'corresponding in substance to' this statute
as it read in 1982 is not limited to the current paragraph (1) but
rather includes at least part of paragraph (5) and perhaps also
part or all of paragraph (4)").

Our inclusion of so much of the new definition within the
reference of the anti-incarceration statute gives force, in this
context, to the Legislature's intention in 1985 to refocus the
definition of developmental disability. That intention is strongly
inferable from the history surrounding the enactment of the
Division of Developmental Disabilities Act in 1985. *See* Statement
of the Senate Institutions, Health and Welfare Committee, S.
1826, 201st Leg., 2nd Sess. at 1 (June 18, 1984). In 1982, the same
year that the Legislature enacted the Code of Juvenile Justice, the
New Jersey Developmental Disabilities Council (Council) issued
its report, *Redirection of the Division of Mental Retardation to a
Division of Developmental Disabilities* (1982) [hereinafter *Re-
port* ].[1] The Council, regarded as "the moving force behind the
passage of the 1985 Act," *T.L. v. Division of Developmental
Disabilities,* 243 *N.J.Super.* 476, 490, 580 *A.*2d 272 (App.Div.1990),
explained in its 1982 Report that the definition of developmental
disability had evolved from a focus on medical diagnosis to a new
focus on functional limitations. *Report* at 3. The Council cited
empirical data indicating that "a developmental disability[,] re-
gardless of diagnosis, most often implies multiple functional limita-

---

[1] The Council is "the official state advisory body appointed by the Governor to
plan for and coordinate services to developmentally disabled citizens of New
Jersey." *Report* at 1. Its members "are appointed by the Governor, and are
either representatives of state agencies serving developmentally disabled per-
sons, consumers of services (the disabled and parents of disabled persons), or
are otherwise concerned with services to the developmentally disabled popula-
tion in New Jersey." *Id.* at 5.

tions requiring special and similar services throughout childhood and adult life." *Ibid.* That focus on functional limitations resulted from the recognition of common service needs shared by all developmentally-disabled individuals, who endure "long term, substantial (and often multiple) handicaps which occur early in life." [2] *Id.* at 4. The Council recommended adopting the definition of the American Association on Mental Deficiency in order to develop a program approach emphasizing the common needs of the population to be served. *Id.* at 24 (citing and quoting American Association on Mental Deficiency, *Manual on Terminology and Classification in Mental Retardation* (Special Publication Series No. 2, 1973)).

That the Legislature intended by the 1985 enactment to amend the definition of developmental disability used in the Juvenile Code is further evidenced by the parallel concerns considered and expressed about the treatment of the developmentally disabled in the juvenile justice system. It was widely recognized that the prohibition on the incarceration of developmentally-disabled delinquent juveniles arose from "a concern that correctional institutions were being used as dumping grounds for offenders with serious mental limitations and/or other developmental handicaps." Juvenile Delinquency Disposition Commission, *The Impact of the N.J.Code of Juvenile Justice: First Annual Report* 81 (1986) [hereinafter *Impact of the Code* ]; *see* Task Force on the Develop-

---

[2] As the Council explained, there were in 1982 approximately 75,000 developmentally disabled persons in New Jersey, and

[m]ore than half of these persons have a primary diagnosis of mental retardation. The balance includes individuals with a wide range of primary diagnoses including spina bifida, cerebral palsy, epilepsy, autism, and persons with combinations of different handicapping conditions. This list is not all inclusive, and any individual who has any of these conditions must also meet the criteria regarding severity, chronicity, and age of onset to be considered developmentally disabled.

[*Report* at 4.]

The Legislature has found that "approximately 2% of the residents of this State are developmentally disabled and more than 50,000 of these persons are developmentally disabled school age children." *N.J.S.A.* 30:1AA–10.

mentally Disabled Offender, *Dealing with the Developmentally Disabled Juvenile Offender: A Special Report to the Legislature* 1 (approximately 1989) [hereinafter *Special Report* ]. "Our State has a 'strong moral and legal commitment to care for the handicapped.' *N.J.S.A.* 2A:4A–44c(2) reflects this commitment. In this context, it is difficult to contemplate the incarceration, without care, of an autistic or a severely retarded child." *State in the Interest of A.B.*, 109 *N.J.* 195, 200, 536 *A.*2d 240 (1988) (quoting *New Jersey Ass'n for Retarded Citizens, Inc. v. New Jersey Dep't of Human Services*, 89 *N.J.* 234, 249, 445 *A.*2d 704 (1982)). The statute prohibiting the incarceration of developmentally-disabled juveniles arose out of concern for their plight when jailed. *See Impact of the Code, supra,* 81–82, 95 (concluding that "many seriously impaired, multiply handicapped, low I.Q. juveniles with adaptive problems are being committed to state correctional facilities," and further noting that although the Department of Corrections has attempted to provide services for those juveniles, "the Department . . . lacks the resources and the mandate to provide [the necessary] care," and observing that "[d]isabled offenders are prone to be targets in [correctional] settings and clearly need special treatment"). *See also* Ellis and Luckasson, *Mentally Retarded Criminal Defendants,* 53 *Geo.Wash.L.Rev.* 414, 479–80 (1985) (noting that " '[m]entally retarded persons meet with unremitting hardships in prison.' They are more likely to be victimized, exploited, and injured than other inmates").

Insofar as the definition of developmental disability now focuses on functional limitations, we determine that the Legislature must have intended that that focus, presently contained in paragraph (4), be applied in the context of the prohibition against the incarceration of developmentally-disabled juveniles. Further, based on a careful reading of the respective statutes and the relevant legislative history, we impute to the Legislature the intent to incorporate paragraphs (1), (4) and (5) within the reference of *N.J.S.A.* 2A:4A–44c(2). We conclude, further, that the judicial understanding, interpretation, and application of that statutory definition must acknowledge and reflect the strong and

continuing legislative and administrative concern to prevent the incarceration of juveniles suffering from developmental disabilities.

## III

A critical problem facing the juvenile justice system is the difficulty in identifying developmentally-disabled juveniles. The system "is poorly equipped to identify or diagnose a developmental disability." *Special Report, supra,* at 8. According to the Task Force, "[c]ourt intake personnel indicate that they are not really equipped to detect a developmental disability and individuals are uncertain who has responsibility to do what. Judges say that they are unable to determine who is or is not classified as developmentally disabled." *Id.* at 6. Furthermore, determining whether an individual is developmentally disabled can be a difficult task even for those with expertise in the field. "Experts agree that there are many individuals who exhibit 'borderline' characteristics, but cannot actually be diagnosed as disabled or be eligible for services traditionally afforded to the developmentally disabled." *Id.* at 5.

The Legislature, by the 1985 Act, enacted measures designed in part to alleviate the problems of identification. Thus, the law not only amended the definition of developmental disability, but also established a Division of Developmental Disabilities (Division or DDD) in the State Department of Human Services, with the powers and duties of the former Division of Mental Retardation assigned to it. *N.J.S.A.* 30:6D–28. The Director of the Division has the authority to establish procedures for the determination of eligibility for the services of the Director. *N.J.S.A.* 30:6D–27b.

We take special note of the difficulties faced by courts that would alone try to identify developmentally-disabled juveniles, and of the existence of a state agency that has professional competence and both regulatory authority and administrative responsibility over eligible developmentally-disabled persons. In the proper

administration of juvenile justice, the issue of identification is crucial:

[proper identification] is the first step toward remediation. It is unlikely that the court can develop its own capacity to perform this function. It is also unnecessary and duplicative. Rather, responsibility for dealing with the developmentally disabled rests with ... the New Jersey Department of Human Services/Division of Developmental Disabilities.

[*Special Report, supra*, at 11.]

*See also* Juvenile Delinquency Commission, *Juvenile Justice: Toward Completing the Unfinished Agenda* 43 (1988) (noting concern of Governor's Committee on Children's Services Planning Mental Health Forum that juveniles with severe emotional problems might not be evaluated prior to sentencing and urging that juveniles be administered a diagnostic instrument that "would identify those in need of more in-depth evaluation"). Our exposition of the procedures to be followed in determining whether a delinquent juvenile is developmentally disabled, and therefore not subject to incarceration, is influenced by those circumstances.

When a juvenile has been adjudicated delinquent, the family court conducts a dispositional hearing. *N.J.S.A.* 2A:4A–41. In general terms, the court is bound to impose only such dispositions as are "consistent with the purposes" of the Code of Juvenile Justice, *N.J.S.A.* 2A:4A–24a, but the court possesses broad authority to order any of a wide variety of dispositions. Authorized dispositions include probation, counseling, community service, incarceration, and commitment of the juvenile to an appropriate agency. *N.J.S.A.* 2A:4A–43b. The pertinent statute lists the factors that may guide the court in determining the appropriate disposition for a juvenile adjudicated delinquent. *N.J.S.A.* 2A:4A–43a(1) to (8). Among those factors are:

(3) The juvenile's age, previous record, prior social service received and out-of-home placement history;

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

(6) Whether the disposition recognizes and treats the unique physical, psychological and social characteristics and needs of the child;

(7) Whether the disposition contributes to the developmental needs of the child, including the academic and social needs of the child where he has mental retardation or learning disabilities; and

(8) Any other circumstance related to the offense and the juvenile's social history as deemed appropriate by the court.

[*N.J.S.A.* 2A:4A–43a.]

Prior to ordering a disposition, the court can "refer the juvenile to an appropriate individual, agency or institution for examination and evaluation." *N.J.S.A.* 2A:4A–42a. Family court rules allow the court to

refer the juvenile to an appropriate individual, agency or institution on such terms as may be appropriate for examination and evaluation.... The court may also confer and consult with such individuals and agencies as may be appropriate to the juvenile's situation and may convene a predisposition conference to discuss and recommend disposition.

[*R.* 5:24–2(a).]

In devising its plan for dealing both civilly and under the Code of Juvenile Justice with developmentally-disabled juveniles, the Legislature intended to coordinate as much as possible the operations of the courts with those of the various administrative agencies of government having responsibilities over such juveniles. We conclude that existing statutes and court rules thus authorize the family court to refer a delinquent juvenile who may be developmentally disabled to the DDD for evaluation, prior to ordering a disposition.

We understand that the Division's resources are presently in short supply and subject to extraordinary demands. Moreover, in the competition for the resources of the Division, delinquent juveniles are likely to face special difficulties in getting access to needed services. Governor's Advisory Council on Juvenile Justice, *Final Report* at 80 (Dec. 30, 1994). Nevertheless, the legislative scheme clearly entrusts to the DDD primary responsibility for identifying and treating developmentally-disabled juveniles. We must therefore consider the circumstances under which the family court should refer a juvenile to the DDD for an evaluation as a basis for an appropriate disposition.

We now rule that if evidence offered at the dispositional hearing suggests a substantial likelihood that a delinquent juvenile is developmentally disabled, the family court may order the Division to evaluate the juvenile. Where the evidence does not establish or strongly suggest a developmental disability, the family court may order any authorized disposition, including incarceration if otherwise deemed appropriate.

We rule further that the juvenile has the burden of offering sufficient evidence to warrant a referral to the Division. Nevertheless, because the family court has a nondelegable statutory duty to impose only a disposition that comports with the Juvenile Code, *N.J.S.A.* 2A:4A–24a, if the court is confronted with, or aware of, evidence that indicates a substantial likelihood of developmental disability, it should, on its own initiative, order a reference to the DDD or request the juvenile or the State to proffer additional evidence in order to make an informed threshold decision.

In response to a referral, the Division shall submit to the family court a report containing its determination concerning the condition of the juvenile. Both the State and the juvenile are entitled to challenge the Division's determination and seek a plenary hearing. *See State v. Howard,* 110 *N.J.* 113, 126–31, 539 *A.*2d 1203 (1988) (noting in context of adult prosecution for serious sexual offenses, that on receipt of report from Adult Diagnostic and Treatment Center at Avenel finding that defendant's "conduct was characterized by a pattern of repetitive, compulsive behavior," *N.J.S.A.* 2C:47–3a, defendant can demand that the sentencing court hold a hearing at which defendant can challenge report). If it appears to the family court that there are controverted facts or that the evidence is incomplete, the court should hold a plenary hearing to receive further evidence on the question of whether the juvenile is developmentally disabled. At that plenary hearing, it should require experts to provide evidence on the issue of developmental disability. *See, e.g., State in the Interest of A.B., supra,*

109 *N.J.* at 197, 536 *A.*2d 240 (referring to conclusions of expert's reports).

Because the Division has acquired a certain expertise · in the identification of developmentally-disabled persons, the court should place substantial weight on the findings and determination of the Division. Nevertheless, because the family court alone is responsible for determining the appropriate disposition under the Juvenile Code, it bears the ultimate responsibility for the determination of developmental disability. In order to reject the DDD's determination, the court must find by a preponderance of the evidence that the DDD's diagnosis was incorrect. *Cf. Howard, supra,* 110 *N.J.* at 131, 539 *A.*2d 1203 (requiring defendant to prove by preponderance of evidence that he is not a repetitive and compulsive sex offender to overcome contrary finding of Avenel report).

If the court finds that the juvenile is developmentally disabled, the court shall undertake to determine an appropriate disposition other than incarceration. In that endeavor, the court should require the Division, the parties, and such other experts and agencies as the court deems helpful, to assist in the formulation of a suitable treatment plan. *See N.J.S.A.* 2A:4A–42a; *R.* 5:24–2(a).

In the exercise of its sound discretion, the family court may order any authorized disposition in such a case, except, of course, incarceration. *See N.J.S.A.* 2A:4A–43b (listing authorized dispositions). Among the alternatives to incarceration that a court may consider is placement of the juvenile with the Division. *N.J.S.A.* 2A:4A–43b(6); *see N.J.A.C.* 10:46–3.1(a)(4) (authorizing "a court having jurisdiction over a minor" to make application to the Division for a determination of eligibility for services as developmentally disabled). Eligibility for the services of the Division is restricted to persons who are "developmentally disabled pursuant to subsection b. of this section and who [have] been declared eligible for services provided by the division." *N.J.S.A.* 30:6D– 25e; *N.J.A.C.* 10:46–2.1(a). The Division has the power to "pro-

vide services for eligible developmentally disabled persons by identifying appropriate programs to meet their needs." *N.J.S.A.* 30:6D–27a. The court, however, must be satisfied that the juvenile is amenable to the treatment and care available through the Division in order to make such a disposition. The family court may also consider as a possible disposition commitment of the juvenile to the Department of Human Services' Division of Youth and Family Services. *N.J.S.A.* 2A:4A–43b(5).

 In view of the acknowledged complexity that surrounds the identification and determination of a developmental disability, we recognize that a juvenile may be subjected to incarceration if the evidence is insufficient to establish a developmental disability. If, however, it appears in such a case that the evidence concerning the juvenile's condition could be further clarified or supplemented so as to demonstrate a developmental disability, the family court has the authority to re-evaluate the juvenile and reconsider the disposition. The family court retains jurisdiction over delinquent juveniles and has the power to recall cases previously decided and to modify dispositions previously ordered. *Rule* 5:24–5 provides in pertinent part:

> (a) Mandatory Retention of Jurisdiction. The court shall retain jurisdiction over every action in which it has entered an order of disposition for the duration of the dispositional terms and conditions.... If the disposition was an order of commitment or incarceration the court may, during the duration of that disposition, substitute any other disposition otherwise available to it.

Family Part court rules further empower courts to "correct, change or modify an order of disposition at any time pursuant to law," and to effectuate that power, allow courts to entertain applications for post-disposition relief. *R.* 5:24–6. Indeed, in this case, the family court did retain jurisdiction for purposes of supervising any future placements of R.M. That power of recall enables the family court to reconsider a disposition or to require an evaluation of the juvenile in order to determine whether there exists a developmental disability warranting a change of disposition.

## IV

██ We must finally consider whether the evidence was sufficient to indicate a substantial likelihood that R.M. was developmentally disabled, and if so, whether the court abused its discretion in failing either to refer R.M. to the Division of Developmental Disabilities for an evaluation or to recall the parties for the purpose of conducting a further hearing to clarify or supplement the evidentiary record.

Because the specific question of whether R.M. is developmentally disabled was not raised at the dispositional hearing, the evidence did not directly address the criteria of developmental disability established by the statute. Instead, the evidence introduced at the hearing was intended more generally to show that R.M. suffers from a variety of social and intellectual deficits that tend to mitigate his offense.

In now claiming that he is developmentally disabled, R.M. relies substantially on the report of psychologist Dr. Frank J. Dyer. According to Dr. Dyer, R.M. is mildly retarded, perhaps autistic, and "a good candidate for psychiatric disability." Educational records, generally, indicate that R.M.'s academic achievement is low, and significantly low in certain respects. However, other evaluators of R.M. have reached conflicting conclusions. For example, the test results suggesting that R.M. is mildly retarded are not corroborated by prior testing. Although those prior evaluations do not support Dr. Dyer's conclusion that R.M. is functioning in the mildly retarded range, they may suggest organic impairment. The evaluations indicating organic impairment, however, are themselves not uncontradicted. One such evaluation, nevertheless, notes that R.M. continues to exhibit perceptual deficits, that he is learning-disabled, and that he may have other problems.

R.M. did present some evidence of deficits in adaptive behavior. Dr. Dyer concluded that R.M. has very little potential to succeed in employment, which may suggest that R.M. is limited in the adaptive skill area of work (or in his capacity for economic self-

sufficiency). R.M.'s poor academic performance and his learning disability also may suggest that he is limited in the adaptive skill area of learning. R.M. additionally contends that the record reveals questions about his ability to live independently. Emergency psychiatric evaluations indicate that R.M. is depressed and has suicidal tendencies, but it is unclear whether such evidence suggests an inability to live independently, or merely confirms his psychiatric diagnosis as emotionally disturbed. Indeed, "[b]y June 16, 1992, DYFS believed that R.M. was ready for independent living and [he] was made to understand that within a short period of time he had to obtain a job."

We are satisfied that the evidence does not establish a developmental disability. *State in the Interest of A.B., supra,* is instructive. The court in that case found that the evidence presented at a plenary dispositional hearing was insufficient to justify finding that the juvenile was developmentally disabled within the meaning of *N.J.S.A.* 30:6D–3a and *N.J.S.A.* 2A:44c(2). As the Court concluded,

> Although the testimony adduced at the waiver hearing revealed that A.B. suffers both from a minimal brain dysfunction and from a low intelligence quotient which places him in a borderline category of intellectual functioning, we are satisfied that the record before the Family Part did not warrant a finding of functional impairment in the statutory sense of a "developmental disability."
>
> [*A.B., supra,* 109 *N.J.* at 197, 536 *A.*2d 240 (citation omitted).]

In this case, although there is some evidence suggesting that R.M. functions in the mildly retarded range and may suffer organic impairment, there was insufficient evidence and no finding that R.M. was substantially functionally limited in three or more areas of major life activity, and there was no evidence or other indication that his disability required special care. *Cf. T.L. v. Division of Developmental Disabilities,* 243 *N.J.Super.* 476, 478–87, 58 *A.*2d 272 (App.Div.1990) (reversing in civil administrative proceedings determination of DDD that juvenile was not developmentally disabled and eligible for services and emphasizing quality and extent of expert testimony and evidence demonstrating that juvenile was substantially functionally limited, especially evidence

of results of Critical Adaptive Behaviors Inventory (CABI), "the standard DDD test for determining an applicant's level of functioning"; noting also that evidence was tailored to statutory criteria and that expert found significant limitations in two areas, and that results of CABI indicated significant limitations in at least four, and as many as six, areas of major life activity).

We are confronted with a record that did not address the statutory criteria for determining the existence of a developmental disability, and R.M. did not introduce evidence of functional limitations sufficient to warrant referral to the Division for evaluation and a determination of eligibility. We are unable, on this record, to determine that there is sufficient evidence to indicate that R.M. is developmentally disabled. However, because the criteria for determining whether a developmental disability exists are not susceptible of precise proof or simplistic evaluation, we are reluctant to conclude on this record that R.M. cannot satisfy the statutory standard. Accordingly, we hold that R.M. may petition the family court to exercise its retained jurisdiction to modify R.M.'s disposition or to recall R.M. for purposes of supplementing the record and for further evaluation. *R.* 5:24-5 to -6. In support of such a petition, R.M. may present evidence substantiating his claim of developmental disability.

V

The judgment of the Appellate Division is modified, and we affirm that judgment as modified.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.